PALMER *v.* TAYLOR.

Opinion delivered March 2, 1925.

1. BUSINESS TRUSTS—FRAUD.—Inconsistent recitals in a declaration of a common-law trust stating on one page that the subscriptions were paid for and on another page that they were paid with notes *held* not to show that the whole scheme was fraudulent or that the trustees practiced a fraud upon the Bank Commissioner to secure a permit to do business.

2. BUSINESS TRUSTS—FRAUDULENT REPRESENTATION.—Evidence and declaration of trust filed with the Bank Commissioner as a public record, under Crawford & Moses' Dig., § 764, *held* not to support a finding that subscriptions to a common-law trust were secured by fraudulently representing, that the organization was in fact a corporation.

3. BUSINESS TRUSTS—AUTHORITY TO DO BUSINESS.—Trustees under a common-law trust may do business in this State under general statutes other than those regulating limited partnership and corporations.

4. BUSINESS TRUSTS—AUTHORITY TO SELL STOCK.—Whether a business trust formed to manufacture automobiles should be allowed to sell stock in the State *held* to be within the discretion of the Bank Commissioner.

5. BUSINESS TRUSTS—SALE OF STOCK—FRAUD.—Sale of stock in a business trust for anything other than cash was not evidence of fraud where the Bank Commissioner's permit did not require cash payments.

6. BUSINESS TRUSTS—POWERS AND LIABILITIES OF TRUSTEE.—Under a declaration of a common-law trust, the trustees are principals and not merely agents of the stockholders, and they are personally liable for the indebtedness growing out of transactions relating to the trust estate.

7. BUSINESS TRUSTS—STOCK SUBSCRIPTIONS.—Subscriptions to stock in a common-law trust are not gifts but investments of which the trustee takes title as owner.

8. BUSINESS TRUSTS—FRAUD.—A provision in a declaration of a common-law trust that a shareholder shall not have the right to call for a partition or division or dissolution of the trust, or an accounting, *held* not fraudulent as entitling the trustees to convert the assets of the company or to render them immune from accounting therefor, but only to preclude a suit for partition or division, or for an accounting, from operating to dissolve the trust.

9. BUSINESS TRUSTS—FRAUD.—Authority conferred by a declaration of trust to expend 30 per cent. of the proceeds of the sale of stock *held* not to show a fraudulent intent in organizing the trust.

10. BUSINESS TRUSTS—FRAUD.—Payment by a common-law trust of 30 per cent. of the proceeds of stock subscriptions for commissions to sales agents pursuant to authority conferred by the declaration of trust *held* not a fraud on prospective investors.

11. BUSINESS TRUSTS—SUBSCRIPTION—RESCISSION.—A subscription to stock in a common-law trust will not be rescinded because the trustees failed to perform fully a printing contract given to the subscriber in consideration of his purchase of stock where it appeared that the contract might have been fully performed if the trust had not failed.

Appeal from Pulaski Chancery Court; *John E. Martineau*, Chancellor; affirmed.

*Gannaway & Gannaway* and *E. G. Shoffner*, for appellants.

The whole scheme was inherently fraudulent. 159 Ark. 621; 162 Ark. 90; 110 U. S. 630; 98 N. E. 391; 52 N.Y. 492, 497; 3 N. Y. Supp. 392-93 W. Va. 324; 112 S. E. 579; 144 S. W. 158; 209 Pac. 36.

The stock sales were void because the permit was secured by violating the penal provisions of the Blue Sky law. 129 Ark. 416; Act No. 242, Acts 1915 § 885, title; Cowan's Manuel of Securities Laws, 1923; 147 Ark. 408;

C. & M. Dig. §§ 751, 753, 754, 756, 757, 762, 764, 766, 770; 147 Ark. 252; 6 R. C. L. 833, § 223; 236 S. W. 694; 104 Cal. 473, 38 Pac. 102; 168 Minn. 386, 134 N. W. 482; 172 N. W. 620; 187 N. W. 874; 50 Pa. St. 399; 144 S. W. 158.

False representations to the Bank Commissioner constituted a fraud upon him and upon all subsequent purchasers of stock. 162 N. W. 753; Thompson on Corporations, 1922 Supp. 718, § 4150.

Particular false representation to, and breaches of contracts with, plaintiffs justify rescission. 112 S. E. 579; 122 N. E. 634; 189 Pac. 116; 52 N. Y. Supp. 139; 98 N. E. 391. Failure to disclose material facts constituted fraud upon the plaintiffs.   98 N. E. 391; 131 Ark. 382.

The chancellor erred in refusing relief under the alternative prayer for a receiver  and  an  accounting 150 Ark. 398.

*Mehaffy & Mehaffy,* for appellees.

There is no proof in the entire record of any fraud on the part of the appellees. The cases cited by the appellants have no application here, and, on the facts, the findings of the chancellor will not be disturbed unless found to be clearly against the preponderance of the evidence. 158 Ark. 641; 157 Ark. 600; 156 Ark. 473; 153 Ark. 56; *Id.* 133; 155 Ark. 305.

SMITH, J.   George E. Palmer, J. H. Parkin and J. T. Goyer, appellants here, filed separate suits in the Pulaski Chancery Court against Charles E. Taylor, C. F. Bizzell, A. W. Sloss and H. W. Anderson.  The basis of the complaint in each case was that the defendants were the promoters and trustees of the Curtis Motor Car Company, which had been organized under a declaration of trust, and it was alleged that, for various reasons, the entire organization was invalid, and that the sales of stock which had been made by the trustees were in violation of law, and were void.

These plaintiffs alleged that certain material misrepresentations had been made to them to induce them to purchase stock, and that these misrepresentations constituted a fraud upon them, and they prayed a rescis-

sion of the contracts of sale of the stock made to them, which they alleged was worthless, and there was an alternative prayer that, if the validity of the sales of stock was upheld, the defendants, as officers and trustees of the company, be required to make an accounting to the stockholders of the funds and property of the trust estate. A tender of the stock to defendants was made, and judgment was prayed for the amounts paid therefor.

The general allegations of misrepresentation and fraud will be set out and discussed. In addition to these allegations common to all three complaints, Palmer alleged that he was induced to buy stock by reason of a promise made to him that he would be, and later had been, made a member of a board of associate directors, and still later that he had been made a member of the advisory board of the company, when there was, in fact, no such board. Parkin alleged that he had agreed to buy a thousand dollars of stock in consideration of an agreement on the part of the trustees to buy from him two thousand dollars' worth of printing and printing supplies, whereas the trustees bought only fifteen hundred dollars' worth of supplies, of which a thousand dollars had been paid in stock and the balance in cash. Goyer alleged that he had been induced to buy stock in consideration of an agreement that he should be made a member of the advisory board, and he alleged, as Palmer had done, that there was no such board.

The cases were consolidated for trial in the chancery court, and, upon final hearing, were dismissed as being without equity, and they have been consolidated here and briefed as a single case.

The general allegations of fraud are that authority to do business was secured from the Bank Commissioner on October 13, 1919, by reason of false statements in regard to the assets which had been assigned to the trustees by the parties making the declaration of trust, in that it was represented that the company had sold 163 shares of stock, and had on hand in actual cash

$1,545.65, and $6,603.35 in notes, which statements were
false, and that, after authorization to do business and
to sell stock had been obtained, misrepresentations were
made to prospective purchasers of stock in advertising
matter which the defendants had caused to be published
and circulated over the State as to the character of the
organization, it being represented that the organiza-
tion was in effect a corporation and was doing busi-
ness as such, and had an authorized capital of two million
dollars, when it was not a corporation at all. That
the defendants represented to the Bank Commis-
sioner that they had each invested a thousand dol-
lars in cash in the company, when they had, in fact,
invested nothing. That it was falsely represented to
the State Bank Commissioner that three persons, to-wit:
E. Audigier, A. S. Maddox and Ben Q. Adams, had, for
themselves and for all others who might become inter-
ested, transferred certain money and personal property
to the trustees, whereas they had not, in fact, transferred
to the trustees either money or personal property. That
the declaration of trust contained the provision "that
the shareholders shall not have the right to call for a
partition or division or a dissolution of the trust, or an
accounting," and that these provisions evinced a fraudu-
lent intent. That the provisions of the declaration of
trust allowed the trustees to expend thirty per cent. of
the proceeds of all stock for commissions in selling stock
and for promotion purposes, and that this itself so
impaired the capital of the concern as to render it fraudu-
lent. That a prospectus was prepared by the trustees
on the faith of which plaintiffs purchased the stock; that
in this prospectus it was represented that there was no
preferred stock, and that every shareholder had equal
rights and privileges, and that the company would be
controlled by a board of trustees or directors who were
selected by the shareholders themselves, when, in fact,
the trustees had already been chosen, and their appoint-
ment was for life, and no shareholder had any voice in
the management of the company, as the management

was entirely in the hands of the trustees. And that there were certain false representations in regard to operating expenses.

Upon these allegations a large amount of testimony was taken, which we shall only summarize, and, stated in a chronological order, it is as follows:

In March or April, 1919, defendants Sloss and Bizzell conceived the idea of organizing a company to manufacture and sell automobiles, trucks and tractors in Little Rock. Neither of them had ever had any experience in operating factories or in the automobile business, and neither appears to have had any considerable capital to invest in the business. After deciding that there were wonderful possibilities in the enterprise, they enlisted the interest of Charles E. Taylor, who was about to retire from the office of mayor of Little Rock, but who, like themselves, was without experience in operating factories, and who had no considerable capital to invest. These three men made an extensive investigation of the automobile industry, and obtained figures showing some of the great fortunes which had been made in this industry on small investments. At that time money was plentiful, credit was easy, and the manufacturers of automobiles had a demand for cars which they were unable to supply. These gentlemen pursued their investigations in Detroit and in eastern cities, and became convinced that the necessary capital was the only thing required.

They were advised that a number of industries had been started by trustees under the common-law declaration of trust whereby the trustees assumed permanent control of the project and sold stock entitling the holders thereof to a proportionate part of any profits earned. Among other concerns of this kind to which their attention was called was a company in Dallas, Texas, known as the Texas Motor-Car Company, and they went to Texas and, after investigation, they decided to organize as that concern had done, and to this end they secured a copy of the declaration of trust under which the Texas company was operating, and, after making a few com-

paratively unimportant changes in the instrument to meet local conditions, they submitted their plans to the State Bank Commissioner, who was persuaded that the scheme was feasible, and who stated that he would grant authority for it to do business in the State and to sell stock.

As a part of the preliminary plans, Audigier, Maddox and Adams were interested in the project and induced to become parties thereto and to subscribe for stock, and their names were used in the declaration of trust as the promoters of the scheme, and it was recited that they had transferred "certain moneys and personal property with the intention that same shall be held upon the trust hereinafter expressed concerning said properties so transferred."

Adams had, at the time, subscribed for $100 in stock, of which $30 had been paid at the time the declaration of trust was filed with the Bank Commissioner. The balance of $70 was later paid. Similar subscriptions were obtained from Audigier and Maddox, and similar payments were made by them.

The declaration of trust named Taylor, Sloss and Bizzell as trustees, and they had each subscribed for a thousand dollars of the stock, and so also had H. W. Anderson, who, although not named as trustee, had been employed by the trustees to assist in promoting the scheme.

It is earnestly insisted that the statement in the application for a permit to do business in regard to these subscriptions shows that the whole scheme was fraudulent, because authority to do business was obtained as a result of the false representation made to the State Bank Commissioners in regard to these subscriptions, in this, that it was recited in the application for a permit that said parties had each subscribed for a thousand dollars in stock and had paid cash therefor, when they had only given their notes for their stock.

It is true that, on one page of the application for a permit there was a recital that these four persons had

paid for their stock, but on another page, it was shown that they had only given notes, and these parties, as witnesses, testified that they did not observe this discrepancy, and that they treated their notes as payments for the stock, and it was shown in the application how the payments were made by them.

It must be conceded that this was indeed a small beginning for what was intended to be a two-million dollar concern, but it had to begin, and, as counsel for appellees say, no one had the right to expect another to donate the capital for the concern to operate on. When one views the wreck of the enterprise, it does appear now that the scheme was visionary; but we must view the undertaking from the perspective of the promoters, for the question is not whether it was visionary—a fact which now certainly appears—but is rather, whether it was fraudulent, and we have reached the conclusion that it was not.

We do not think any fraud was practiced on the State Bank Commissioner to secure his permit to do business. The very instrument which shows the erroneous, and therefore false, statement of the company's assets, also shows the truth in that respect.

Departing, for the moment, from the chronological order of the statement to further discuss the notes executed by the appellees for their stock, it may be said that appellants insist that these notes were never paid, and were never intended to be paid, and that the fraudulent character of the whole scheme was thus shown. Appellees insist, however, and so testified, that these notes were paid, and that payment was made in the performance of necessary services which the declaration of trust contemplated should be rendered by them to the company.

We do not stop to inquire whether the notes could have been legally paid in this manner. If they could not, this was a proper matter for the chancery court to have considered in winding up the affairs of the company, as was done by that court in the receivership which was later ordered. If these notes were not in fact paid, they

were a part of the assets of the company, to be distri-
buted by the chancery court in winding up the company's
affairs, and the appellants would have had no right to
wholly appropriate the proceeds thereof to the satisfac-
tion of the demands they are here seeking to assert.
Indeed, this is not a suit to collect these notes, but is one
to hold appellees, as trustees, liable for stock which appel-
lants say they were induced to buy by reason of false and
fraudulent representations made them.

In this connection, it may be said that appellees con-
tend that they had already rendered, at the time the
notes were executed, services of a greater value than
the face of the notes, and had incurred large personal
expenses in their preliminary travels and investigations,
exceeding the face of the notes, which inured to the bene-
fit of all subsequent subscribers for stock. It is unneces-
sary to decide here whether these promoters had the
right to charge these expenses to the company or not,
and we do not do so. It is only necessary to decide
whether the giving of these notes shows a plan to
defraud, and we have concluded that this fact does not
show any such intention, and we have also concluded
that there were no such representations in regard to
assets contained in the application for the permit as
would warrant a finding that the Bank Commissioner's
permit was obtained through fraud practiced on that offi-
cial.

We do not think the testimony supports the conten-
tion of appellants or warrants the finding by us that
subscriptions for stock were secured by the representa-
tion that the company was, in fact, a corporation. It is
true that the advertising matter circulated by the sales
agents in making sales of stock referred to the trustees
as president, vice president, secretary and treasurer,
respectively; but these titles only indicated the functions
which the respective trustees performed.

The declaration of trust, which, when filed with the
Bank Commissioner, became a public record (§ 764, C. &
M. Digest), disclosed the nature of the enterprise, and

there was nothing about it to indicate an intention to leave or to create the impression that the concern was in fact a corporation, and it appears from various bits of correspondence in the record that, when the question of its character was involved, it was plainly stated.

The enterprise was not an unlawful one, however ill-considered it may have been.

In the recent case of *Coleman* v. *McKee,* 162 Ark. 90, we held, as we had previously done in the case of *Betts* v. *Hackathorn,* 159 Ark. 621, that the trustees under a common-law trust may do business in this State under general statutes other than those regulating limited partnerships and corporations.

As to whether or not such authority should have been given in this case, was a question calling for the exercise of a discretion vested at that time in the State Bank Commissioner, and, in fairness to that official, it may be said that this discretion was exercised at a time when, according to the testimony, money was plentiful and the apparent demand for automobiles was insatiable.

It is next insisted that the fact that stock was sold for anything except cash paid, at the time, was an evidence of fraud, as that action was not authorized by the State Bank Commissioner. The indorsement on the application for a permit to do business was: "Examined, and sale of shares at par for $50 each authorized." The declaration of trust had stated that the shares would be $50 each, that is, any one investing $50 would be entitled to a receipt, called a share, showing that fact. But this was not a corporation, and the Bank Commissioner did not impose the requirement that the full amount of the subscription should be paid when made.

It is insisted that the provision of the declaration of trust, "that the shareholders shall not have the right to call for a partition or division or a dissolution of the trust or an accounting," on its face evinced a fraudulent intent.

We do not think the presence of this recital in the declaration of trust proves fraud. Its purpose was to

give permanency to the trust thus created. Under agreements of this character the trustee is principal, and it is not a mere agent for the *cestui que* trust who invests, and it is upon this theory that he is held personally liable for the indebtedness growing out of transactions in relation to the trust estate. *Betts* v. *Hackathorn, supra.*

We do not construe the language quoted as giving the trustees the right to convert or otherwise misappropriate the assets of the concern or to have immunity from accounting therefor. It could not be said that the trustees were asking or had been granted any such power if any other construction could be given the language. This was not a gift, but was supposed to be an investment, of which the trustees took the title as owners, and we think the fair and proper construction of the language is that no suit for partition or division or for an accounting should operate to dissolve the trust.

There was at least no false representation about this language, for it appeared in the declaration of trust upon which the permission to do business was asked, and was existent when all the stock purchases in question were made.

It is next urged that authority to expend thirty per cent. of all sums collected so operated necessarily to impair the capital of the concern as to doom it to failure from the beginning, and was therefore fraudulent. What we have said about the provision in regard to a dissolution or an accounting is equally applicable to this contention.

It appears, further, that it was contemplated that a large part of the thirty per cent. was to be paid, and was in fact paid, to sales agents for selling stock. It does appear to be a large per cent., but there was no proof that it was unusually large for an enterprise of this kind. A very large amount of money must necessarily have been raised to have made the enterprise a success, and we cannot say judicially that this was a fraud on prospective investors. It is not denied that authority was conferred to charge it.

The prospectus was filed with the Bank Commissioner in connection with the other papers in the case, and in this prospectus it was stated: "There is no preferred stock or bonds. Every shareholder has equal rights and privileges, and all shares have equal earning capacity. This company will be controlled by a board of trustees or directors who are selected by the shareholders."

This does not appear to have been a candid statement of the facts; but we presume the Bank Commissioner considered it in connection with the recitals of the declaration of trust which he had before him when his permit was issued, and he knew, of course, that the concern would be controlled by the trustees who were therein named.

There were no preferred stocks or bonds, and the shareholders did have equal rights and privileges.

The concern was to be controlled by the trustees, who acquired their power as such under the declaration of trust, which became effective after the application for a permit was approved. This recital was intended to advise the Bank Commissioner how the concern would operate if the permit was granted, and the same thing may be said of other recitals in the prospectus filed with the Bank Commissioner in regard to the protection of shareholders and savings to them.

In regard to the specific allegations of misrepresentations which appellants testified were made to them, it may be said that Palmer and Goyer were, in fact, selected by the trustees as associate directors, and Palmer was selected a member of what was designated as an advisory committee. Palmer and Goyer were given certificates showing that they had been selected as associate directors, but there was nothing in these certificates to indicate that the original trustees did not have the title to and control of the property. These certificates recited what the duties of the associate directors would be, to-wit: (1) To advise with the officers of the company concerning local investments; (2) to give the com-

pany such information as it may desire concerning the financial responsibility of prospective subscribers for stock living in Little Rock and vicinity; (3) to assist, by proper and consistent means, the officers and authorized representatives of the company in the sale of its shares until same had been disposed of.

The certificate given Palmer appointing him a member of the advisory committee was of similar purport.

These appointments ceased to be of value because the enterprise failed and was abandoned.

Parkin testified that he was induced to buy a thousand dollars of the stock by the promise that printed matter amounting to two thousand dollars would be purchased from him. As a matter of fact, the company did order printing matter from him amounting to $1,497, which paid for his stock, and the balance was paid him in cash. But this is not a suit on his part for damages for a breach of this contract, but one for its rescission, and we do not think this shows any fraud or misrepresentation which warrants rescission. The contract contemplated that the company would continue in business, and had it done so the balance of the order might have been filled.

We have discussed the principal allegations and testimony in support thereof, which appellants contend show that the enterprise was fraudulent and entitle them to a rescission of their contracts for the purchase of the stock, and have concluded, upon the whole case, that the chancellor's finding that the complaints are without equity is not clearly against the preponderance of the evidence.

The testimony shows that the trustees were men of good standing, and that they devoted about two years of their time in an earnest but unsuccessful effort to launch the enterprise. Stock subscriptions totaling $178,900 were received, of which $21,800 were canceled, and $107,500 were actually paid in for stock.

A statement showing the expenditure of this money was furnished Palmer, and was made an exhibit to his

testimony. Much evidence was offered in regard to the items there shown which we will not discuss. It suffices to say that the company incurred and discharged large expense in preparing to manufacture or to assemble automobiles. The company purchased a patent on a tractor, which, after investigation and experiment, was believed to be one which could be manufactured and sold profitably. Actual operation of a plant was begun, and, after large expense had been incurred, about twenty-six four-cylinder cars were put on the market, as well as one six-cylinder car. But, about the time the trustees had expected to begin operations, the panic following the war, which brought ruin to so many people, came, and no more stock could be sold, subscriptions for stock were canceled by some and others refused to pay the balance due on subscriptions, and most of the sales of automobiles which were made were effected by accepting old cars in payment of new ones, and the enterprise ended in a receivership.

Much stress is laid on the fact that, at one of the last meetings held by the trustees, they entered an order on their records appropriating to themselves certain second-hand cars in payment of alleged balances due them from the company, and the good faith of this transaction was called into question. It suffices to say, in answer to this contention, that, if this action was unauthorized, it did not warrant the rescission of the contracts for the sale of the stock.

Summarizing this testimony, we have concluded, after carefully considering it, that the testimony does not establish the contention of appellants that the project was a fraudulent one.

In addition to the facts herein stated, there are two other outstanding facts which lead to the conclusion that the trustees were acting in good faith in soliciting subscriptions for stock. One is that they paid the debts of the concern as they went along, and the second is the comparatively small amount the three trustees received for about two years' work. They did receive a very

large per cent. of the amount of the subscriptions paid, but the testimony shows that this was largely paid to sales agents for selling stock. If we charge the trustees with all amounts which, according to appellants, they must have received, they did not receive compensation at all indicative of dishonesty.

It follows, from what we have said, that the chancery court properly dismissed the suits for rescission, and that finding also inures to the benefit of Anderson. In addition, it is shown that Anderson was not a trustee, but a mere employee who had no control of the business.

Affirmed.