[L. A. No. 15122. In Bank.—October 19, 1936.]

HOOPER C. DUNBAR et al., Respondents, v. L. V. RED-
FIELD et al., Appellants.

Joseph L. Lewinson, Morris E. Cohn, Erwin P. Werner, George L. Hampton, J. W. Falkner and Joseph Scott for Appellants.

Walter F. Haas, H. C. Johnston, Stanley F. Maurseth, Gerald E. Kerrin, Haas, Johnston, Maurseth & Kerrin, Cullinan, Hickey & Sweigert, Haight, Trippett & Syvertson, Raymond L. Haight, Arthur L. Syvertson, Eustace Cullinan, William T. Sweigert, Evans, Pearce & Campbell and Albert D. Pearce for Respondents.

THOMPSON, J.—A hearing was granted in this case, after decision by the District Court of Appeal, Fourth Appellate District, in order to give further consideration to two questions involved, which are discussed hereinafter. We were and are in accord with the remainder of the opinion rendered by the District Court of Appeal, and it is hereby adopted as a portion of our opinion and is as follows:

"This is an action for declaratory relief brought by the trustees of a common law trust for the purpose of establishing the meaning and intent of the declaration of trust upon which the association was founded.

"The Bell View Oil Syndicate, which will hereinafter be referred to as the syndicate, was organized on January 20, 1922, for the purpose of drilling for oil on a town lot in Santa Fe Springs consisting of about one-third of an acre. The declaration of trust which was signed on that day by the five organizers appointed the signers thereof as trustees with the power to fill any vacancies. One of these trustees resigned shortly thereafter and the plaintiff Morris took his place. Two of the trustees died in 1925 and, without filling the vacancies, the three plaintiffs have continued to administer the affairs of the trust.

"The declaration of trust, after providing that the trust estate should consist of 5000 units of the par value of $100 each, provided that 1000 of these units should be given to H. W. McFarlane, one of the original trustees, in consideration of the transfer to the trust estate of a lease on this town lot. It was then provided that the trustees were to sell such additional units as might be necessary to provide funds for carrying out the objects of the trust, subject to the approval of the commissioner of corporations. The lease was transferred to the trust by McFarlane and 1000 units were issued to him. In order to secure funds with which to drill for oil the trustees sold units of beneficial interest in this trust and at the time of the trial of this action there were outstanding such units of the par value of $300,000, of which the three plaintiffs owned nearly one-fifth. The venture was highly successful and, at the time of the trial, more than $5,000,000 had been received for oil produced from this lot and the dividends paid to the unit holders averaged 64 per cent a year on the par value of the units.

"A number of suits were brought against the trustees by various unit holders, and finally this action was brought by the trustees for the purpose of having an adjudication as to the meaning and intent of the declaration of trust and as to their rights under this instrument. The complaint sets out all of the claims that had theretofore been raised by any unit holders with regard to the manner in which the trust had been administered, with a statement of the

trustees' contentions with respect thereto. Cross-complaints were filed by certain of the unit holders alleging that the trustees had taken secret profits, that they had wasted funds of the trust in wildcat operations, that they had taken compensation as trustees to which they were not entitled, that in various other respects they had been guilty of mismanagement of the trust and praying for their removal as such trustees. The trial court found in all respects in favor of the plaintiff trustees and this appeal followed.

■ "The first point raised is that the units issued to McFarlane in exchange for the lease were divided among the five original trustees and constituted a secret profit which, under the law, must be returned to the trust estate, together with all income therefrom. It is argued that the original trustees planned the organization of this syndicate before they secured the lease in question, that they became trustees from that moment, and that anything done by them thereafter must accrue to the benefit of all subsequent unit holders since there was no disclosure of the facts.

"The appellants rely upon *Burbank* v. *Dennis,* 101 Cal. 90 [35 Pac. 444], and *Victor Oil Co.* v. *Drum,* 184 Cal. 226 [193 Pac. 243]. In the first of these cases the promoters of a corporation falsely represented to the proposed stockholders that they were conveying lands to the corporation at cost, when in fact they turned in the land at an increased price and took the resulting profit out of the cash paid by purchasers of stock. In the second case, one of the promoters concealed the facts that he was making a profit from a similar transaction and that he was one of the organizers of the corporation. It was there held that after starting such an enterprise one of the organizers thereof could not purchase property and sell it to the company at an advance in price in the absence of a full disclosure of the facts. It was further held that this duty of disclosure was owed to those persons who were induced to come into the enterprise and that, in that case, a subscription agreement which was signed by subsequent purchasers of stock failed to make such a disclosure.

"The appellants rely upon the following facts as bringing this case within the rules laid down in the cases just referred to. On January 10, 1922, the five persons who later became the original trustees in this syndicate signed a

written agreement setting forth that they were desirous of forming a syndicate for the purpose of acquiring an oil lease from H. W. McFarlane, one of the five, covering this lot in Santa Fe Springs; that it was essential to this plan to secure a lease of the property; that they authorized Mc-Farlane to take the lease in his own name for the purpose of transferring it to a syndicate to be organized; that such a syndicate should be capitalized on a unit basis with 5000 units of $100 par value each; that the parties to this agreement should constitute the trustees; that each party thereto would subscribe for ten units at $100 each when the syndicate was organized; that 1000 of these units should be taken as promotion stock for and in consideration of the lease; that a portion of the thousand shares should be given as a bonus to the first purchasers of units in the syndicate; and that twenty units out of the 1000 should be given to certain persons named for services already rendered. On January 12, 1922, McFarlane secured a written lease, providing that the lessor should receive one-third of all oil produced and should receive, within fifteen days, $4,000 in cash to be treated as an advance on his first royalty. This $4,000 was later paid out of the proceeds of the sale of units, each trustee paying in $1,000 for ten units in accordance with their agreement. It should also be observed that, in accordance with the agreement, 245 of the units exchanged for the lease were given as bonuses to the first purchasers of units and the remaining 755 of these units were divided among the five trustees.

"The controlling question is whether there was such a disclosure of the essential facts to subsequent purchasers of units as is required by the rule laid down in the cases above referred to. Certain other facts have a bearing on this question. The respondent Horton spent three months looking over the Santa Fe Springs field in search of a lease which he might develop. He found the property in question, and before associating himself with anyone else he agreed with the owner of the land on the terms of the lease. He then selected the persons who became the other trustees to assist him in raising funds with which to develop the property. The agreement of January 10, 1922, the securing of a written lease, and the organization of the syndicate followed. For convenience the lease was taken in the name

of McFarlane and transferred by him to the syndicate. The agreement of January 10, 1922, was kept at all times in the office of the syndicate in a file marked 'Trust Papers', was always available, was handed with the other papers to an auditor examining the records of the syndicate on behalf of certain unit holders and was produced at the trial.

"A permit to issue and sell units was obtained from the commissioner of corporations, copies of the declaration of trust and the lease being attached to the application therefor. The application set forth that McFarlane, as owner of the lease, was to transfer it to the syndicate, in exchange for 1000 units, subject to the approval of the commissioner, and that each of the applicants had subscribed for ten units and had paid $1,000 into the treasury, out of which it was proposed to pay the $4,000 called for by the lease. Permission was asked for the issuance of 1000 units to McFarlane in exchange for the lease and for the sale of other units to be sold so as to net 80 per cent of the selling price. The commissioner was also asked to approve the plan of using a portion of the units to be issued to McFarlane for the purpose of giving a 50 per cent bonus in units on the first 300 units actually sold and a 25 per cent bonus on the next 300 units sold. A permit was issued, reciting the general facts outlined in the application, and granting permission to sell units as requested and to issue 1000 units to McFarlane in exchange for the lease, describing the same and giving the book and page where it was recorded. The permit further provided that these units should be placed in escrow and not released until the further order of the commissioner, and that a copy of the permit be delivered to each prospective purchaser of units. The McFarlane units were placed in escrow and were later released and divided among the five trustees, after a showing as to the amount already paid to other investors. The certificates of beneficial interest issued to purchasers contained a reference to the declaration of trust, with a statement that it was recorded in the office of the county recorder of Los Angeles county, and each purchaser signed a written acknowledgment that he had received and read a copy of the permit. Other permits were later issued with relation to which similar facts appear.

"Assuming that these persons were acting as trustees from the date of their original agreement, January 10, 1922, we think the evidence sustains the court's finding that there was a sufficient disclosure of the material facts to subsequent unit holders, and that it cannot be said that secret profits were taken which must be returned to the trust estate. (*Garretson* v. *Pacific Crude Oil Co.*, 146 Cal. 184 [79 Pac. 838].) The original trustees acquired the lease before this syndicate was organized and before any other unit holder acquired any interest therein. While they agreed upon the general plan to be followed before acquiring a written lease, they had sought out and discovered the property and come to an understanding with the owner thereof before entering into the agreement of January 10, 1922. The lease was on record, its exact terms were set forth in the declaration of trust, and both were furnished to the corporation commissioner. The permit fully referred to both instruments and clearly set forth what McFarlane, one of the trustees, was to receive. ■ So far as subsequent unit holders were concerned the material fact was that such a consideration was to be paid. This being well understood and agreed to, a subsequent unit holder was in no way injured by the fact that the consideration he was willing to pay in order to acquire· an interest in the lease was to be divided with the other organizers of the syndicate. (*Victor Oil Co.* v. *Drum, supra.*)

■ "It is contended that the trustees secured an amendment to the trust agreement by false representations and that the amendment is invalid. The trust agreement provided that it might be amended with the consent of two-thirds of the unit holders. In 1925, it was so amended as to permit the trustees to build up a reserve fund and to invest in new ventures aside from the original lease. It is argued that a letter which the trustees sent out asking consent to this amendment gave certain reasons therefor, whereas their testimony discloses other reasons. It is also argued that this letter was fraudulent because it contained a dividend check for 10 per cent which was calculated to put the unit holders in a mellow frame of mind, and because it falsely stated that the trust estate had lost valuable opportunities, and held out the hope that other lucrative properties in the Santa Fe Springs field might be obtained

if the trustees were permitted to build up a reserve which might be used for that purpose. More than two-thirds of the unit holders consented in writing to this amendment and the trial court found against the appellants on all allegations of fraud with respect to this transaction. The evidence fully sustains these findings and we find nothing therein which would have sustained a finding to the contrary.

"It is next contended that the trustees exceeded their powers by investing portions of the trust funds in leases and properties other than in the Santa Fe Springs field. It is claimed that the trustees spent approximately $400,000 in an effort to develop oil on some fifteen leases or projects outside of that field, without success except for one in the Signal Hill field which was only moderately successful. This entire project was started for the purpose of discovering and developing oil wells and, after a considerable measure of success had been obtained, the unit holders amended the trust agreement for the specific purpose of authorizing and enabling the trustees to extend their operations and attempt to develop and produce oil on other properties. The fact that most of the later ventures were not successful in no way indicates that the trustees exceeded the authority thus given in attempting to carry out the wishes of the unit holders. The appellants argue that the trustees were only authorized 'to develop . . . oil properties', that most of the new projects failed to produce oil, and that, therefore, they were not developing oil properties and were acting in excess of their power. The trustees made a full and complete report of all of these transactions to the successive annual meetings of unit holders, the trust agreement was amended to permit them to do just such things, and the entire circumstances, as shown by the evidence, do not support the narrow construction now sought to be placed upon the power granted.

"Some contention is made that the trustees improperly accumulated a large reserve and that the original provision that 90 per cent of the income should be paid out in dividends must be taken as showing the real intention of the parties. We are unable to follow this line of reasoning in view of the amendment adopted and the subsequent conduct of all of the parties."

It is also asserted that the trustees should return certain commissions they paid themselves on the sale of units. It appears that each of the original trustees sold units on which he was given the 20 per cent commission allowed by the terms of the permit. The trial court found that these trustees were licensed brokers, that the sales upon which they received commissions were made by them in their individual capacities and not as trustees, nor within the scope of their duties as trustees, or in the handling of the trust estate, nor were they "in derogation of said trust estate". It is specifically found that they "were not called upon or required by the terms and provisions of said Declaration of Trust to make such sales as trustees thereof and/or without compensation therefor". The court also found that the trustees at all times endeavored faithfully to perform all of their duties as trustees for the best interests of the trust estate. There is ample testimony to the effect that, although the trustees were charged with the responsibility of getting a well drilled on the property and, after losing the first one at a depth of about 2,900 feet, with the obligation of starting another, in order to maintain the good standing of the lease; and that it was practically impossible to secure salesmen at the percentage of 20 per cent allowed by the permit to cover commissions and costs, because they were among the first in the Santa Fe Springs field, which was not only a deep field but also the leases covered small lots, to which the public was not then accustomed, and also because other operators were finding means by which they were paying more than 20 per cent. In order to prevent the undertaking from becoming a failure, the trustees were obliged to sell a good many units personally and, in order to do this, were obliged in effect to remit to the purchaser the commission taken, so that, while they are charged with commissions on the books, a large portion thereof was not in fact collected by them. It is also to be observed that the declaration of trust provides that the trustees shall fix the compensation of all agents and "pay to themselves such compensation for their own service as they may deem reasonable".

The question at this juncture is whether, under these circumstances and the findings of the trial court, the respondents were bound to account for the compensation they re-

ceived by way of commissions. The trial court held that they were not. We feel compelled by reason and the authorities to sustain this conclusion. In a comparatively early case, *Graves* v. *Mono Lake Hydraulic Min. Co.*, 81 Cal. 303 [22 Pac. 665], this court announced what we conceive to be the true rule which should govern trustees of corporations or business trusts. It is there held that a contract adopted by a board of directors, to which the vote of the interested director or directors is necessary, is voidable at the instance of the corporation or, in the event of its failure to act, at the election of a minority of the stockholders "without regard to whether they [the resolutions] were fair and honest or not". However, the court was careful to point out in that case that no question of the value of the services rendered was involved, and quoted with approval from *Gardner* v. *Butler*, 30 N. J. Eq. 702, as follows:

"The rule is, that the trustee cannot fortify himself by a contract which he makes with himself or for his own benefit, and set it up either at law or in equity as a valid obligation. . . . But while the express undertaking is without legal force, the directors of a company have a right to serve it in the capacity of officers, agents, or employees, and for such services the law will enable them to recover a just and reasonable compensation. . . . No claim which they may make against their company can acquire any support or validity from the fact that they have expressly sanctioned it; it must rest exclusively upon its fairness and justice, and be enforced upon the *quantum meruit.*" To the same general effect reference may be had to *San Leandro Canning Co.* v. *Perillo*, 84 Cal. App. 635, 639 [258 Pac. 670]; *Bassett* v. *Fairchild*, 132 Cal. 637, 643 [64 Pac. 1082, 52 L. R. A. 611], and cases there cited. In *Voorhees* v. *Mason*, 245 Ill. 256 [91 N. E. 1056, 1059], where a similar question was involved, it was held that a resolution allowing the directors commissions could not govern, but it was said: "The services of the secretary and other officers of the corporation in making sales of stock and income certificates were of value to the corporation, and upon proof of the value of such sales, regardless of the resolution, they may rightfully be allowed compensation for making such sales."

(See, also, *Palmer* v. *Taylor*, 168 Ark. 127 [269 S. W. 996, 1001].)

The other question is quite similar to the one just discussed. The appellants contend that the trustees took compensation for themselves which was unreasonable and not justified by the terms of the trust agreement, after they had fixed their compensation in lesser amounts. There is a clause of the agreement which provides as follows: "Said trustees are hereby vested with the sole power and discretion to discern what will constitute principal and what will constitute gross income and net income available for payment or distribution under the terms of this trust, provided, however, that not to exceed ten (10) per cent of all moneys received by the trustees shall be used to defray office expenses, officers' salaries and all overhead expenses." As we have already observed, the trust provided that, subject to the limitation just quoted, the trustees were authorized to pay themselves such compensation as they deemed reasonable. On April 7, 1922, the board fixed a salary for respondent Horton, as secretary, of $350 a month and, on April 22, 1924, they voted themselves a salary of $150 a month from January 20, 1922, to April 20, 1924, "in consideration of the time given by each of the trustees to the affairs of the syndicate, and of the value of the services rendered". Beginning August 8, 1929, Horton was raised to $500 a month and respondent Dunbar was paid $350 a month. Beginning January, 1932, Morris was given a salary of $100 a month. In addition to the amounts thus paid and beginning in December, 1924, and at intervals. thereafter, the trustees paid to themselves as compensation considerable sums of money, but kept within the limit of 10 per cent of the moneys received, after deducting other office expenses and overhead.

Two of the trustees died in 1925, and the vacancies were not filled.

The trial court found that the respondent trustees had not taken more compensation than allowed by the terms of the trust agreement and had taken less than the 10 per cent named in the trust agreement, after deducting office and other overhead expenses. It also found that the salaries which we have mentioned were not intended to compensate the trustees for their services in full, but "were fixed in

such amounts among the trustees alone for extraordinary services rendered said Trust as such officers as aforesaid, in equalizing their total compensation and the drawing thereof as between themselves". And more important still, the court found that the sums taken by respondents as compensation did not exceed the reasonable value of the services rendered by them to the Bell View Oil Syndicate.

The appellants contend that the resolutions fixing the salaries preclude the respondents from paying other compensation, but the answer to this assertion is contained in the finding to the effect that such resolutions were intended only to equalize the compensation as between the trustees. It cannot be denied that the testimony of the trustees amply supports the finding of the court in this regard. Nor can it be denied that the court's finding that the compensation was reasonable was abundantly supported. Starting with nothing, the trustees, in the course of 12 years, with an issued capital of $300,000, paid out in dividends to the unit holders practically $2,000,000, at the same time accumulating physical assets valued in round figures at $500,000. Undoubtedly the court took into consideration that, while in times when the income of the trust was large, the compensation of the trustees was large, in times when the income was small, the compensation would be small and perhaps, under the limitation, nothing at all. Averaging the total compensation over the period in question, Horton received approximately $1200 a month and Dunbar about $962 a month, while Morris received an average of around $842 a month. We cannot say that the court was not justified in concluding that the compensation was reasonable. In fact, as the record appears to us, it would hardly have been possible for the court to have decided otherwise. We should mention, however, that, in our opinion, the trustees must not only be restrained by the 10 per cent limitation, but also by the reasonable value of the services rendered.

 It is also argued that the limitation of 10 per cent was intended to apply to net income instead of gross income. After an exhaustive hearing, the trial court concluded otherwise, and we are not inclined, under the circumstances, to disagree therewith. The language of the trust agreement indicates that it was intended to mean a percentage of the gross—"all moneys received by the trus-

tees''. Indeed, we doubt that it could be construed differently.

■ "The last point raised is that the respondent trustees were guilty of such fraud in settling a prior action brought against them as necessitates their removal. An action was brought against the respondents by one Penn, raising most of the claims which are involved in the present action. That action was tried, and the judge entered a minute order finding in favor of the trustees on all points except with respect to the matter of the compensation taken by them. On that point he found against them and ordered that judgment be entered against them in the sum of $247,500. Before findings were made and formal judgment entered the attorneys for all parties to that action entered into a compromise agreement under which that action was dismissed. These three trustees agreed to pay $25,000 to Penn's attorneys for attorney fees and costs, some $6,000 of which was paid by the trustees personally, the rest to be paid after a successful termination of this action. It was further agreed that the trustees would bring an action for declaratory relief, raising the question of compensation and all other claims that had been made against them by any of the unit holders, and for the purpose of obtaining an adjudication as to the meaning of the trust agreement on all disputed points. This action followed immediately. The former judgment had not become final and, in any event, applied only to the parties thereto and left unsettled the claims of many other unit holders. There is much to be said in favor of having the entire controversy between the various parties settled in one action in an orderly manner. This plan having been agreed upon, and at once carried into execution, it does not conclusively appear that the trustees were actuated by fraudulent motives. After a full hearing on this point the trial court found in favor of the respondents and we see no reason for setting aside that finding.''

It follows that the judgment should be and it is hereby affirmed.

Waste, C. J., Seawell, J., Langdon, J., and Curtis, J., concurred.

Rehearing denied.