[Civ. No. 9796. First Appellate District, Division One.—August 28, 1936.]

C. C. JULIAN, Plaintiff, v. W. A. SCHWARTZ et al., Defendants.

L. V. REDFIELD et al., Appellants, v. BARNHART–MARROW CONSOLIDATED et al., Respondents.

Olson & Olson, J. W. Falkner, Culbert L. Olson, Hanna & Morton, Leon B. Brown and Hyams & Himrod, for Appellants.

Moote & Longcroft, F. D. R. Moote, Noren Eaton and Simpson & Simpson for Respondents.

WARD, J., *pro tem.*—This proceeding involves conflicting claims to certain oil wells in the Santa Fe Oil Field in the county of Los Angeles. By stipulation, or without objection, certain documents were introduced in evidence. Therefrom the history pertaining to the premises essential to the consideration of the issues raised by the pleadings may be stated as follows: On November 10, 1921, Lem A. Brunson and wife leased to the Globe Petroleum Company all of the north half of the north half of the northeast quarter of the southwest quarter of section six (6), township three (3) south, range eleven (11) west, S. B. B. & M., excepting certain portions to be reserved for roads, water courses, etc. This lease provided for a one-sixth royalty to be paid the lessors,

and will be hereinafter referred to as the "Brunson lease". On June 2, 1922, the Globe Petroleum Company, the lessee under the Brunson lease, executed a sublease to C. C. Julian, the plaintiff in this proceeding, covering the west 543 feet of the premises designated in the Brunson lease. It provided for a total royalty of thirty per cent. This lease will be referred to as the "first Globe lease". Under date of June 17, 1922, Julian assigned to the Citizens Trust and Savings Bank of Los Angeles (subsequently the Citizens National Trust and Savings Bank, hereinafter referred to as the "Citizens Bank") the northwest 209 feet of the property included in the first Globe lease. This assignment was recorded. At the same time the Citizens Bank executed a declaration of trust reciting the receipt of the assignment and that the property was held in trust with power to reconvey the same at the end of the term of the lease to the lessee, his heirs or assigns, subject to any assignment meanwhile that might be made of the proceeds of the petroleum produced from any well on the premises upon notification by the lessee of the assignment. The declaration of trust provided for compensation to the trustee and the appointment of Julian for the term of the trust as director of drilling or development of the project and exclusive agent for each and every assignee of interest in the production of oil in the premises. Under date of September 5, 1922, Julian assigned to the Citizens Bank the northeast 209 feet of the property covered in the first Globe lease, and the Citizens Bank executed a declaration of trust in substantially the same form as that executed in connection with the first assignment to the bank. Under date of February 5, 1923, Julian executed a third assignment to said bank, whereby the first Globe lease was assigned to said bank in so far as it covered the premises not theretofore assigned to the bank by the first two assignments above referred to. This assignment was not recorded. Under date of February 5, 1923, the bank issued a declaration of trust in the same form as that executed on the occasion of the two previous assignments of portions of the first Globe lease. In March, 1923, the Globe Petroleum Company executed another sublease to Julian, which was duly recorded, whereby the east 543 feet of the premises described in the Brunson lease were leased to Julian with the requirement that two wells should

be drilled thereon. Julian, in conjunction with J. F. Beyer and J. H. Roth, his associates, assigned this second Globe lease to the Citizens Bank. The bank executed a declaration of trust similar in substance and form to the first trust document.

Julian had drilled or caused to be drilled on the premises referred to in the first Globe lease wells designated as 1, 2, and 3, and under the second Globe lease wells 11 and 12. All wells produced oil until the early part of the year 1925, when wells 2, 3, 11 and 12 declined in or ceased production. On January 15, 1925, an agreement was made between Julian and his associates with D. R. Morrow and W. J. Barnhart to clean and repair and diligently operate all of the wells on the premises referred to in the agreement. Morrow and Barnhart had the right to use all the tools and equipment, the property of Julian and his associates, and agreed to supply any additional necessary equipment at their own expense. Morrow and Barnhart undertook, within five months, to increase the gross production of oil to an average of 210 barrels per day. The operators were to be reimbursed from the gross production of oil and gas from all of the wells for all moneys expended in cleaning, operating and fishing the wells, but not for tools or equipment, and to receive one-half of the remaining oil and gas exclusive of the landholders' royalties. Morrow and Barnhart returned the wells to production.

On March 9, 1928, the United Oil Well Supply Company, Wm. B. Himrod, W. W. Hyams, and Lem A. Brunson and wife, the successors in ownership to the fee of the property, entered into a lease with W. J. Barnhart, as lessee, covering the premises described in the first and second Globe leases. This lease will be referred to as the "United Lease." It provided for the drilling of wells upon the property for a royalty of one-sixth as to all wells drilled to a depth of 6,000 feet, and a royalty of one-fifth as to wells drilled to a depth of 5,000 feet, and was ratified by the Citizens Bank. On September 28, 1928, Barnhart executed an assignment of a portion of the leased premises to Julian, reserving the right to drill on the premises except the wells or premises wherein Julian retained a half interest. Subsequently Barnhart assigned his reserved and excepted rights to Barnhart-Morrow Consolidated. The last-named

company drilled a certain well designated as No. 16. Julian, under the assignment of the United lease, drilled three wells, Nos. 14, 15, and 17. The lessors subsequently declared Nos. 14 and 15 abandoned, and thereupon leased these particular wells to J. A. Smith. Litigation between Julian and Smith followed, which resulted in Smith taking possession of the two wells. Under the direction of the receiver in *Smith* v. *Julian,* wells 14 and 15 were placed upon production. Julian sold his interest in No. 16 to Wm. M. Cady, who in turn sold to Smith. The various lessees, assignees, operators and drillers were unsuccessful in producing substantial quantities of oil from No. 12. The history of well 17 will be given hereafter.

Following the execution of the assignments of the first Globe lease and the declaration of trust, Julian executed, sold and delivered to various purchasers documents entitled "Regular Well Number One Participating Oil Agreements", giving the purchasers thereof fractional interests in the residue of the proceeds of the sale or other disposal of the net production of the well after taxes, royalties and operating expenses had been paid. The participating agreements were substantially in the same form, except the date, the number, and the name of the purchaser. Subsequently Julian executed and delivered to numerous purchasers documents referred to as "Special Well No. 1 Participating Oil Agreements". The purchasers paid $100 for each participating agreement, entitling the purchaser to the residue of production from well No. 1. A similar procedure was adopted relative to wells Nos. 2 and 3. Some difference appears relative to the percentage of the residue of the proceeds, but with this exception they are practically and substantially the same. Julian did not apply for a permit from the Commissioner of Corporations for the issuance of these participating oil agreements. Wells 1, 2, and 3 were completed and placed on production.

After the execution and delivery of the second Globe lease "Wells 11, 12 and Pico Participating Oil Agreements" were issued. The wells were on the premises designated in the second Globe lease. Well No. 11 produced oil, but well No. 12 was subsequently abandoned. A permit was issued by the Commissioner of Corporations to an unincorporated association known under the name of C. C. Julian & Company. Ju-

lian also issued assignments of percentages of oil and gas to be produced from the particular property described, which was divided into a single per cent or fraction thereof. Later Julian assigned a certain percentage of the oil and gas from these wells to H. B. Flesher without a permit from the commissioner of corporations.

After the commencement of drilling of the oil well known as well No. 14, located near well No. 1, Julian issued "Assignment of Limited Gross Production Interest in Well No. 14". Well No. 15 was located near well No. 3 property. Julian issued "Assignment of Limited Gross Production Interest in Well No. 15". In addition thereto "C. C. Julian Well No. 14 Participating Oil Agreements" and "C. C. Julian Well No. 15 Participating Oil Agreements" were also issued. All interest of Julian in the entire production of oil from the wells drilled on the premises was assigned, sold or disposed of. The interests purchased by the holders of participating agreements were in small units to a great number of purchasers, for which they paid Julian over a million dollars.

On July 8, 1929, a judgment was rendered against Julian in the Superior Court of Los Angeles County in an action entitled *Garliepp et al.* v. *Julian.* The amount of the judgment was $10,925.98, and arose out of an account which accrued between November, 1928, and January, 1929. The cause of action was not connected with any of the oil wells on the premises involved in this proceeding. A writ of execution was issued upon the judgment, and pursuant to proceedings therefor all of the interest of Julian in the premises referred to in the present case was purportedly sold to one R. L. Mack, an interested party in the Garliepp judgment. A certificate of sale was issued and the sheriff of Los Angeles County signed a document purporting to be a deed, conveying all the right, title, interest and estate of Julian in the wells and premises described in the Brunson and United leases, and all the interest of Julian standing in the name of the Citizens Bank or of Barnhart or Morrow or their successors. Mack conveyed all of his rights in the deed to Schwartz, who is a nominee or dummy for J. A. Smith, one of the litigants in this case.

This action was instituted by Julian, as plaintiff, against defendant Schwartz. The complaint alleged that Julian,

"as a trustee of an express trust, is now and at all times herein mentioned was in the possession and entitled to the possession under the said Declaration of Trust, aforesaid, of all of the property hereinabove described". Julian prayed for an injunction against the claims of Schwartz. Schwartz filed an answer to the Julian complaint, and a cross-complaint against the Citizens Bank and the beneficiaries under the trusts, and against other defendants. The Citizens Bank answered the Schwartz cross-complaint, and subsequently L. V. Redfield, F. E. Foster and H. A. Penn, on behalf of themselves and other beneficiaries of the trusts, filed an answer and a cross-complaint, which caused all of the parties named in the cross-complaint and others to appear in this proceeding. Julian did not answer the cross-complaint of Redfield, Foster and Penn, and his default was duly entered.

Substantially the court found that the documents and instruments heretofore referred to were true and correct, and had been made, entered into, executed and delivered as set forth in a stipulation of facts. The court also found that funds accumulated in each of the trusts had been paid to the holders of participating oil agreements; that the bank did not request the holders of the agreements to sign the declaration of trust; that Schwartz was the owner by purchase and assignment of certain participating oil agreements; that the various agreements, leases, etc., were not made at the instigation of Julian as a result of a conspiracy with other parties to defraud the unit-holders, and that the documents in connection therewith were not sham or fictitious; that at the time of the levy of the execution and at the time of the sale of the premises and the wells, Julian had no interest in the Brunson or the United lease; that Mack and Schwartz had actual knowledge that in 1922 and 1923 Julian had disposed of his interest in the Globe leases to the Citizens Bank in trust, to protect the rights of the unit-holders; that the only consideration Mack gave for the sheriff's deed was a credit against the judgment; that H. B. Flesher was not the owner of certain participating oil agreements, but that he held the same for the use and benefit of Julian, and that they were levied upon and sold as personal property by the sheriff at an execution sale; that Redfield, by mesne conveyances, became the purchaser at such sale. The court decided the

interest, if any, of each party to the proceeding, and proportioned and segregated the rights acquired by purchase or otherwise since the commencement of the action. The court declared and established and directed that judgment be entered in effect that the participating oil agreements were valid instruments, paid for and parted with value therefor, the character and validity of which could not be questioned by a creditor of Julian whose debt was subsequent to their issuance and sale and not connected with the operations of the designated numbered wells; that the unit-holders were not entitled to a judgment against Barnhart or his successors, etc.; and taxed the costs against the respective parties. Defendant and cross-complainant and cross-defendant Schwartz and cross-defendants and cross-complaints Redfield, Foster and Penn, representing holders of participating oil agreements, appealed from parts of the judgment.

Appellant Schwartz contends that the participating oil agreements transferred no interest in the wells or in the property, and that on the execution sale against Julian all leasehold rights under the Globe leases passed to the execution purchaser. ■ A consideration of all of the provisions of the participating agreements and likewise the declarations of trust is necessary to determine the rights and interests of Schwartz, if any, and the unit-holders. The participating agreements recite that the leases have been assigned to the Citizens Bank, as trustee, for a definite period. They may be classified as chattels real. (*Dabney* v. *Edwards*, 5 Cal. (2d) 1 [53 Pac. (2d) 962, 103 A. L. R. 822].) Under the Globe leases Julian acquired the right to enter upon the land, drill wells and reduce the oil to possession. As the operating lessee he acquired potential possession of the oil which might be produced. (*Western Oil etc. Co.* v. *Venago Oil Corp.*, 218 Cal. 733, 738, 739 [24 Pac. (2d) 971, 88 A. L. R. 1271].) Julian assigned for the use and benefit of himself and the unit-holders all the interest he possessed, ''without power in the trustee other than to reconvey the lease at the end of said term to said lessee or his assigns''. His ''assigns'' at that time were the unit-holders. The assignment was made, however, subject ''to any assignment meanwhile made by said Lessee of the proceeds of the petroleum produced from any well on said premises''. Julian thereby reserved unto himself the right to contract with

others to drill on "said premises" and to pay therefor out of the proceeds of the petroleum produced. There were about 3,000 participating holders of agreements. It was impracticable to assign the leases direct to the unit-holders, but they were assigned to the Citizens Bank in trust. The trustee was appointed the attorney-in-fact for the lessee. The bank accepted as trustee the assignments of the leases with certain reservations as to the payment of rent, etc. Julian dispossessed himself of his interest in the leases to the extent of the proceeds of production of oil from each well designated in the participating agreement except the privileges obtained as operating manager for the unit-holders.

Relying on *Black* v. *Solano Co.*, 114 Cal. App. 170 [299 Pac. 843], *In re Lathrap*, 61 Fed. (2d) 37, *Bank of America* v. *Fisher*, 61 Fed. (2d) 53, *Fisher* v. *Bank of America Nat. T. & S. Assn.*, 72 Fed. (2d) 635, *Western Oil etc. Co.* v. *Venago Oil Corp.*, *supra*, and *Schiffman* v. *Richfield Oil Co. of California*, (Cal. App.) 56 Pac. (2d) 296 (now pending before the Supreme Court after decision in the District Court of Appeal), appellant Schwartz contends that the participating oil agreements are only personal promises to pay money, and convey no interest in the leasehold estate. In the cases cited the assignees had no right of possession in the premises. The only right assigned was an interest in the proceeds from the oil produced. The Schiffman case is a fair sample of the facts upon which appellant seeks to uphold his theory. In that case the Monrovia Oil Company, as assignee, executed a document purporting to transfer to plaintiff an interest in the proceeds to be derived from the sale or disposal of a percentage of the net production of a well to be drilled on the leased property. The defendant, through mesne conveyances, acquired title to the rights of the sublease. Plaintiff sued defendant upon plaintiff's alleged right to recover the value of the certain percentage of oil which defendant produced from the well. The appellate court held that the agreement constituted a personal covenant of the Monrovia Oil Company and did not constitute an assignment of an interest in the production of the well. ■ In the instant case the participating agreements did not purport to assign to the unit-holders legal title in the leases, but legal title was placed in the bank as

trustee for the unit-holders, while Julian, as agent of the unit-holders, was given the right to produce and sell oil, and subsequently to create a residue by ascertaining and deducting the operating expenses and other charges. In the case at bar the agreement holders had technical possession of the premises. The possession of Julian as the agent of the unit-holders under the terms of the trust was the possession of the unit-holders.

If the assignments conveyed a present title and the agreements created a present obligation, secured by a present lien, and the declarations of trust provided means of securing these rights in future, then the rights and interests of the unit-holders as the beneficiaries under the trusts were valid and subsisting rights and of interest superior to any claim of a creditor against Julian personally. The trusts served a purpose in protecting the equities of the unit-holders, and cannot be said to be invalid, inactive, dry or passive trusts (*Craven* v. *Dominguez Estate Co.,* 72 Cal. App. 713, 720 [237 Pac. 821]), and existed prior to the accrual of the indebtedness upon which the personal judgment against Julian was rendered. When Julian, as lessee, assigned and transferred the drilling sites to the Citizens Bank in trust for the purchasers of participating agreements, and became the operating manager and agent of the holders of the agreements, he transferred all rights that would be essential to protect his principals, the unit-holders, in the event he did not personally or by contract with others drill upon the designated sites. ''One who grants a thing is presumed to grant also whatever is essential to its use.'' (*Dabney-Johnston Oil Corp.* v. *Walden,* 4 Cal. (2d) 637, 650 [52 Pac. (2d) 237].)

The declarations of trust in substance provided that upon assignments by Julian of the proceeds of the petroleum the trustee was to be immediately furnished with a copy thereof, and that the assignee should signify his acceptance by signature. The Citizens Bank was entitled to a fee for filing, etc., the duplicate assignments. The provision was clearly for the benefit and protection of the bank, and did not invalidate the rights of the assignees. The court found that the omission to sign or file copies of the trust agreement was intentional. The number of assignments ran into the thousands, and it was evidently impractical to en-

force this provision, for which reason it was waived. Courts of equity do not aid in divesting litigants of rights and interests upon matters such as the mere performance of a condition that is immaterial to the validity of the conveyance in so far as a third party's interest is concerned. The bank was the party and only party vitally interested in this provision of the trust.

It was stipulated at the trial that Julian made no application for a permit to sell certain participating agreements, and that a permit was obtained for the issuance of other such agreements. Agreements assigning percentages or the residue of proceeds of production of petrolem are securities. (Corporate Securities Act as amended in 1929, Stats. 1929, p. 1251; *People* v. *Craven*, 219 Cal. 522 [27 Pac. (2d) 906].) It is not necessary in this case to determine whether the issuance of the agreements in 1922 and 1923 were securities under the Corporate Securities Act of 1917 (Stats. 1917, p. 673) as amended in 1919 and 1921 (Stats. 1919, p. 231; Stats. 1921, p. 1114). In this case the unit-holders do not attempt to rescind the agreements, but on the contrary to uphold them. In *Western Oil etc. Co.* v. *Venago Oil Corp., supra,* at page 745, the court said: "The Corporate Securities Act was designed to protect purchasers from worthless securities. In the case herein the units proved to be valuable notwithstanding they were issued without a permit. If the issuer of securities, or the assignee of his lease with notice, were permitted to defeat the sale of fractional interests of oil and gas to be produced, the anomalous situation would exist that the issuer of fractional interests in oil and gas to be produced who violated the law by failing to procure a permit would be in a better position than the individual who complied with the law. The owner who sold units without a permit would be enabled to retain the entire production of the well and reap a large profit, and this, although the act was enacted for the benefit of purchasers." (See *Eberhard* v. *Pacific Southwest L. & M. Co.*, 215 Cal. 226 [9 Pac. (2d) 302]; *Domestic & Foreign Petroleum Co., Ltd.,* v. *Long,* 4 Cal. (2d) 547 [51 Pac. (2d) 73].) It is not the purpose herein to hold that only purchasers of securities may assert their invalidity. Likewise creditors or their representatives and others may assert the invalidity of oil and gas royalties issued in violation of the

Corporate Securities Act. One purpose of the act is to protect merchants and tradesmen. (*People* v. *Kuder*, 98 Cal. App. 206, 216, 217 [276 Pac. 578]; *Cecil B. DeMille Productions, Inc.*, v. *Woolery*, 61 Fed. (2d) 45, 49.) Neither Schwartz nor Mack occupied the position of creditor of Julian in the operation of the wells here in question. The court found and the finding is supported by substantial evidence "that said C. C. Julian had no interest in the premises . . . at the time of the levy of the execution . . . and at the time of said execution sale". The question of the invalidity of the participating agreements as the result of failure to obtain a permit from the corporation commissioner, in so far as it may affect the Schwartz claim, becomes immaterial.

After the execution of the United lease in 1928, Julian executed a document reciting the execution of the United lease and describing the entire premises covered by that lease. A particular portion of such premises was assigned, transferred and conveyed to A. L. Jameson. Concurrently an operating agreement was entered into, and recited that as consideration for the transfer Jameson was to complete well No. 17, which had been partially drilled by Julian, and for that purpose was to use certain equipment belonging to Julian. Provision was made for the payment of the owners' royalty, and that thereafter a certain percentage of the oil was to be the property of Jameson as reimbursement for the expenditure of $100,000 to be used in completing the well. Thereafter the parties were to divide equally all oil produced or saved after payment of landowners' royalty. Other usual provisions of a sublease and an operating agreement were included in the respective documents. The contention of appellant Schwartz is that the two documents must be treated as one instrument, and so considered constituted a sublease from Julian to Jameson, and not a true assignment divesting Julian of all interest in the leasehold premises. The agreement is directed solely to the assignment of fifteen per cent interest in well No. 17. "The failure of those who are dealing in oil rights to precisely describe the nature of the interests granted is due in part to the recent development of the oil industry. The law pertaining thereto is still in a formative stage." (*Dabney-Johnston Oil Corp.* v. *Walden, supra*, at p. 650.) ▮ Am-

biguous and uncertain instruments must be construed with due consideration to the intent of the parties at the time and under the circumstances of execution, and if necessary with an examination of the history of the facts leading up to the execution of the documents.

On December 5, 1928, Julian assigned to Cady an undivided thirty per cent of the residue of the proceeds of the net production of wells Nos. 14, 15 and 17 after operating expenses, royalties and taxes had been paid. Cady assigned ten per cent of his thirty per cent to Jameson. On December 19, 1928, Julian assigned to the Marine Bank a gross overriding royalty interest equivalent to ten per cent of the gross proceeds from oil saved or sold from well No. 17. This assignment was made as security for a loan, and was for the benefit of Jameson to the extent of one-half, and to the extent of the other half to L. Estle, who is not personally a party to this proceeding, but is an officer of the Santa Fe Springs Oil Company, a respondent herein. In this manner the fifteen per cent interest is computed. The Cady and Marine Bank assignments were made subsequent to the time when the account upon which the *Garliepp* v. *Julian* judgment started to accrue, but this judgment was not rendered until July of the following year.

At the time of the Cady assignment well No. 17 was not under operation. The evidence shows that the reservation of half of a certain percentage of the oil, the amount remaining after payment of expenses to Jameson for drilling, was in fact a rental, measured by a fraction of the oil produced. It was an unattached servitude, a burden upon the drilling site which Jameson had agreed to pay to Julian (sec. 802, subd. 4, Civ. Code), and it did not alter the rights or interests of the parties because it was referred to as a royalty. The word "royalty" as used in the instruments under consideration is synonymous with the word "rental". When Julian made his assignment to Cady, he assigned that which Jameson had promised to pay Julian. Upon the assignment of Cady to Jameson, Jameson became the owner of his own promise to pay rental, measured upon the gross production of the oil produced from well No. 17. Julian assigned this right to rental prior to the judgment or the execution sale in *Garliepp* v. *Julian*.

Some question is raised by appellant Schwartz and respondent Jameson relative to the nature and classification of the transaction in the assignment by Julian to the Marine Bank. Schwartz claims that it is a mortgage, and Jameson contends that it has all the characteristics of a pledge. It is not necessary to decide the question. There is no claim made that a conspiracy existed to defraud Garliepp or his assigns or successors in interest in the judgment rights in *Garliepp* v. *Julian*. J. A. Smith, for whom appellant Schwartz is only a dummy, purchased part of the Julian assigned interest to Cady. The Marine Bank and the Cady assignments were executed in December, 1928. The judgment in the Garliepp case was not rendered until the following year. Form in the transfer of interest, or the language used in the instrument, is of less importance than the determination of the intent of the assignor and the assignee, the fairness of the document, its legality, its equitability between the parties, and whether its operation results in detriment to others. Julian had divested himself of all interest in these drilling sites before Mack, Smith or Schwartz held any interest in the Garliepp judgment. The only consideration Mack gave for the sheriff's deed was a credit against the judgment. The only consideration Mack received from Schwartz was the written promise of Smith to pay from the net proceeds of the property described in the deed an amount equal to the full amount of the judgment. The finding that appellant Schwartz held no right, title or interest or estate in well 17 must be approved. Schwartz was not injured as a result of the assignments by Julian to Jameson, to Cady, or to the Marine Bank.

Appellants Redfield, Foster and Penn specify eleven assignments of error, upon which they request a reversal of portions of the judgment. The court found that the holders of the participating oil agreements were the equitable owners of interests in the production and the proceeds of the production in wells, 1, 2, 3, and 11, each being the owner of the fractional interest as provided in the participating agreements, and that such unit-holders were the beneficiaries of the trusts created with the Citizens Bank. The court also found that the unit-holders were entitled to the exclusive possession of the designated wells, and the leased premises upon which the wells were located through their managing

agents, subject to the terms, conditions and provisions of the first and second Globe leases, and subject further to the right of Barnhart-Morrow Consolidated to the actual possession and operation of wells 1, 2, 3, and 11 under and in accordance with its operating agreement as amended. The court further found that the operating agreement and its amendment were fairly made for a valuable consideration, and were not obtained or entered into by duress, collusion, fraud or mistake; and that Barnhart-Morrow Consolidated, their predecessors and successors in interest, performed the conditions precedent to be performed on their part under the agreements. The court also found that no portion of the proceeds of the sale of oil from the wells to which the unit-holders were entitled had been diverted or misappropriated to the use or benefit of Julian or Barnhart or his successors in interest.

Appellants Redfield, Foster and Penn contend that Julian, as managing agent for the unit-holders of the production of oil wells, was without power or authority to make the agreement of January 15, 1925, employing Barnhart or Barnhart and Morrow or any of the corporations they controlled to operate the wells and receive fifty per cent for their services and equipment. Likewise the same contention is made relative to the amended agreement of August 24, 1929, wherein respondents Barnhart-Morrow Consolidated received sixty-five per cent. Into these contentions are injected the questions of fraud and secret profit.

We find no provision in the participating oil agreements or in the declarations of trust, express or implied, prohibiting Julian from contracting with others to drill the wells designated in the agreements. In 1924 on occasions the wells had ceased to produce or had materially declined in production. Unsuccessful efforts to increase production had failed. Mechanical difficulties arose that necessitated "fishing" and other means of clearing the wells of implements and apparatus that had fallen or had become misplaced in the wells. Looking at the project in prospective, there was a good reason to believe that eventually the wells would be abandoned. The testimony given by experts and the evidence of factual conditions is conflicting, but the preponderance thereof clearly upholds the findings thereon. If any conclusion could be reached in relation to the first drilling

contract that fraud and collusion existed, of necessity it must be based upon suspicion and surmise.

As the managing agent for the participating unit-holders to operate, produce, sell and distribute the net proceeds of production remaining after payment of royalties and operating expenses, Julian had the power to assign the production and turn over the operation to others. Julian and his associates were under no obligation to advance funds for repair of the wells. Under the oil lease, pursuant to which all rights arose, the wells were required to be diligently operated. Failure to operate the wells would constitute a breach of the lease. Julian did not appear as a witness in this case, but from other sources, as it appears in the evidence, at that time he had little faith in the future success of the project. He agreed that others upon a speculation should take over the operations to do the mechanical work, and that they should receive a certain percentage of the proceeds of the production of the wells. Ordinarily an agent has no authority to give, as part of compensation, an interest in the principal's business or its profits. (1 Mechem on Agency, 2d ed., sec. 988, pp. 711, 712; sec. 306, p. 224.) The declarations of trust provided that the managing agent should have "exclusive control of said premises and the matters connected therewith . . . " and some of the participating agreements also provided that "the determination of any other matter or thing which, under the terms of said lease, is left to the option or discretion of Lessees, shall be decided and determined by Lessees and their judgment in the premises shall be final and conclusive". Julian gave the participating unit-holders an interest for cash, and the contracting drillers an interest for services to be rendered, in the products that might be developed in the future. All parties were speculating on the results that might be attained. Barnhart-Morrow Consolidated cleaned and drilled the wells to a lower level. Oil was produced in four of the five wells to the benefit of appellants and respondents, and now appellants would have respondents lose the assigned interest in the results achieved. In the absence of proof of fraud it was the duty of the trial court to so construe the transaction that the legal and equitable interest of respondent Barnhart-Morrow Consolidated should be preserved.

In 1929, wells Nos. 2 and 3, according to the evidence of Barnhart, were not producing enough to pay operations, and money was lost due to the mechanical condition of the wells. Barnhart threatened to abandon wells Nos. 2 and 3, as Nos. 4 and 12 had theretofore been abandoned. Julian and Barnhart during this period seem to have been unfriendly, and a W. J. Wellman, a former employee of Julian, acted as an intermediary in arranging an increase in the Barnhart-Morrow Consolidated interest from fifty per cent to sixty-five per cent. Wellman was to be paid half of such increase. Barnhart drilled the wells and obtained additional production. The trustee, Citizens Bank, was advised of the new arrangement. The activities of Wellman in promoting, and the interest of H. B. Flesher, Julian's confidential man, in collecting money from Barnhart-Morrow Consolidated, are indeed suspicious circumstances, but in that category they must remain. Appellants Redfield, Foster and Penn failed to trace these payments by Barnhart-Morrow Consolidated to Flesher to a source over which Julian had control. On this issue the trial court had no other recourse than to find for the respondents Barnhart-Morrow Consolidated.

An agent may delegate his powers to another person when the act is purely mechanical. (Sec. 2349, Civ. Code.) Implied authority may exist to handle and direct a business in the usual and customary manner in the same or a similar locality. The character of the business and the reasonable necessity to adopt a particular method or policy, or to do a certain act, are all proper subjects for consideration, in the absence of a prohibitory clause in a contract to the contrary, in determining the scope of authority or power of an agent. (2 Cor. Jur., p. 643.) Under all the circumstances of this case, Julian had power to do everything reasonably necessary, in the ordinary course of business, to effect the purpose of the agency.

The holders of the participating oil agreements at frequent intervals since the year 1925 were put on notice of the fact that fifty per cent of the net proceeds of the oil produced from wells Nos. 1, 2, 3 and 11 was being paid in operating expenses, and acquiesced in such payments by failing to object thereto. Such acquiescence is now an estoppel of the unit-holders to question the power or authority of Julian to make the operating agreement and the

amendment thereto, or to question. the rights of Barnhart-Morrow Consolidated therein. In substance the trial court so found. Barnhart-Morrow Consolidated, without intent to defraud the unit-holders, entered into these agreements and performed all of the services required. The production of oil was increased. The work performed was of great value to appellant unit-holders. Equity and good conscience forbids appellants Redfield, Foster and Penn from claiming rights that would deprive respondent Barnhart-Morrow Consolidated of reward for the services rendered.

█ In this case there was a dispute as to the knowledge of the unit-holders relative to the making of this agreement. "For certain purposes the law will presume a person to have notice of facts in respect to which he has been put upon inquiry." (18 New Cal. Dig., p. 106.) Respondent Barnhart-Morrow Consolidated held open and notorious possession of the wells for the purpose of drilling. Some of the dividend payments made by the Citizens Bank to the unit-holders contained notice of the amounts paid to Barnhart-Morrow Consolidated. Appellant Foster knew that Barnhart-Morrow Consolidated were in possession of the property and were operating the wells in 1928. Appellant Redfield acquired this information "the latter part of 1925 or the first part of 1926". The bank, acting as trustee for all of the participating unit-holders, was informed of this agreement in the early part of 1925. The years of time elapsing during which no objection was made, and the total absence in the record of any evidence from a holder of a participating agreement that he did not know of the operation of these wells by Barnhart-Morrow Consolidated, justified the trial court in finding that appellants Redfield, Foster and Penn were estopped to question the rights of the parties under the operating agreement or the amendment thereto.

█ Appellants Redfield, Foster and Penn contend that the Barnhart-Morrow agreements were terminable at the will of the unit-holders, and that they were so terminated by the filing of the cross-complaint of Redfield, Foster and Penn. *Boehm* v. *Spreckels*, 183 Cal. 239 [191 Pac. 5], cited by appellants Redfield, Foster and Penn, is not controlling in the present case. The Boehm case was an action for damages for the termination of an agency for an indefinite period, but in that case, as in the instant case, the

provisions of the contract mark the limitations and rights of the respective parties. In the Boehm case there was no period of time fixed or mentioned wherein the agreement to deliver newspapers could be terminated. Pertaining to the subject of forfeiture or termination of the contract, Barnhart and Morrow undertook and agreed to increase the gross production of oil to an average of 210 barrels per day of twenty-four hours, and to continue to maintain such quantity of production. A period of five months was allotted to obtain this amount of production. In the event of failure to maintain such production, upon written notice of intention given thirty days prior thereto, a forfeiture of the Barnhart-Morrow rights and interest would occur. Under the terms of the agreement Julian did not have the right to declare a forfeiture until Barnhart and Morrow were given a five months' period to increase the gross production to the stipulated number of barrels per day. This is the only method provided to terminate the contract. Barnhart and Morrow or their successors performed their part of the contract and continued to so perform until the appointment of a receiver pending this litigation. The decree providing restoration to the respondent Barnhart-Morrow Consolidated of the wells designated was fair and proper.

A lessee, given the exclusive right by an oil lease to enter upon and extract oil from a definite area of land, whether by means of one or more oil wells to be drilled under the lease, has and may enforce this right, and any other drilling or extraction of oil from the leased premises is a trespass. The lessor may modify the terms of the lease if accepted and ratified by the lessee. In the Brunson lease there was no provision relative to the number of wells to be drilled. The only document containing any restriction as to the number of wells to be drilled is the first Globe lease, which provided that only three wells should be drilled. The assignments by Julian to the Citizens Bank of the three portions of the first Globe lease related to the particular description of the portions of the premises. The declarations of trust executed by the Citizens Bank contained no restrictions as to the number of wells to be drilled. The participating agreements sold by Julian expressly provided for payment to the purchasers of a fractional part of the residue

of the proceeds of the particular well described by number. If well No. 1, by freak of nature, assisted perhaps by human agency, drained in whole or in part well No. 2, the unit-holders in No. 2 would be entitled to redress, if any, depending upon the facts and circumstances, against the parties responsible therefor. A particular participating agreement in one well did not therein give the holder thereof any interest in any other well. The rights of the participating agreement holders were fixed by the document each held, and were limited to a percentage of the proceeds of production of a particular well. There is no express or implied restriction in the participating agreements of a particular well that no other well would be drilled on or near the property. On March 9, 1928, the United Oil Well Supply Company, successors to the interest of the Globe Petroleum Corporation, together with Brunson, W. B. Himrod and W. W. Hyams, entered into a lease with Barnhart, who assigned his interest to Barnhart-Morrow · Consolidated, covering a tract of land including the acreage whereon wells Nos. 1, 2, and 3 had been drilled. This lease is referred to in the record as the United lease, and was reassigned to Julian. The Citizens Bank ratified the lease to Barnhart. Upon this property wells Nos. 14, 15, 16 and 17 were drilled or partially drilled. ██ Appellants Redfield, Foster and Penn contend that the unit-holders in wells Nos. 1, 2, and 3 have the sole and exclusive right under the first Globe lease, and that wells Nos. 14, 15, 16 and 17 are trespass wells. The Brunsons were the original owners of the land so far as this litigation is concerned. The first Globe lease was in effect a sublease. The provisions of a sublease are subservient to the terms of the original lease if the provisions are inconsistent. An owner-lessor in oil-producing land may not be deprived of his rights to royalties merely because the lessee subleases and restricts the drilling operations. (*Barnsdall* v. *Boley,* 119 Fed. 191, 200; *J. M. Guffey Petroleum Co.* v. *Jeff Chaison Townsite Co.,* 48 Tex. Civ. App. 555 [107 S. W. 609] ; *Jones* v. *Interstate Oil Corp.,* 115 Cal. App. 302 [1 Pac. (2d) 1051].) An owner-lessor cannot be bound by covenants to which he was not a party, and to which he did not consent directly or by implication. We conclude, therefore, that the lease from the owner-lessor, joined in by the owner of the first Globe lease, accepted by

the sublessee and ratified by the trustee for the unit-holders, was a valid lease and that wells Nos. 14, 15, 16 and 17 are not trespass wells. There is evidence upholding the inference that the United lease was not obtained through fraud. If there is any clear conflict in the findings it has not been brought to our attention. It is not necessary to consider additional arguments presented by respondents to approve the findings proportioning the legal and equitable interests of appellants Redfield, Foster and Penn and the respondents to that appeal.

Appellants Redfield, Foster and Penn contend that the trial court erred in ruling against the admission of certain evidence. The offers to introduce letters linking up other letters admitted in evidence, on questions calling for the opinion of witnesses on purely speculative matters and not based upon reasonable certainty, or the requested opinions from a geological standpoint relative to the risk and hazard in connection with the operation of the wells and not sufficiently predicated upon the mechanical situation which confronted the parties and not shown to have been communicated to the parties to the agreement, or the effort to cross-examine a witness upon matters that he had been previously and thoroughly examined upon, do not present points of sufficient merit to be treated on appeal.

Appellants Redfield, Foster and Penn have also appealed from certain orders made after final judgment. The determination of the appeal from the judgment is a determination of the appeal from the orders made after judgment. These orders were made simply to carry the judgment into effect.

That the trial court erred in denying a motion to vacate parts of the judgment and in denying the motion for a new trial upon certain issues are the next contentions of appellants Redfield, Foster and Penn. The arguments on the motion to vacate have been sufficiently answered herein.

On the motion for a new trial appellants Redfield, Foster and Penn filed an affidavit signed by W. J. Wellman, together with an affidavit showing due diligence and unsuccessful effort to discover and produce Wellman at the trial. The contents of the affidavit of Wellman indicate conspiracy and fraud on the part of Barnhart and Julian and the payment of secret profits to Julian. In part the

affidavit is corroborated by an affidavit of one of the assistant cashiers of the Citizens Bank. The Wellman affidavit brought forth counteraffidavits that challenged the correctness of certain averments of the Wellman affidavit and likewise cast grave doubt upon the truthfulness of Wellman. Under these circumstances we cannot say that the trial judge abused the discretion imposed by rule of law.

The judgment and the orders made after judgment should be affirmed. There is no merit in either appeal. With the exception of Julian, who started this action and defaulted, the numerous litigants herein hold the same legal and equitable position that they occupied prior to the institution of this proceeding.

Judgment and orders affirmed.

Tyler, P. J., and Cashin, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on September 26, 1936, and an application by appellants to have the cause heard in the Supreme Court, after a judgment in the District Court of Appeal, was denied by the Supreme Court on October 26, 1936.