[L. A. No. 17989.   In Bank.   Mar. 11, 1943.]

JOHN W. AUSTIN et al., Respondents, v. HALLMARK OIL COMPANY (a Corporation) et al., Appellants.

Luce, Forward, Lee & Kunzel, Borton, Petrini, Conron & Borton, Schell & Delamer and L. W. Frankley for Appellants.

Charles C. Crouch and George W. Crouch for Respondents.

TRAYNOR, J.—Plaintiffs brought this action to recover a share of the proceeds from the operation of certain oil wells

and to obtain stock in the operating corporation. The facts set forth in the findings of the trial court are as follows: On or about July 1, 1934, John Austin and John Porter entered into an agreement for the acquisition of a lease on some thirty acres of oil-bearing land in Kern County owned by Julius Fried and the Merritt Annex Oil Company. They agreed that if Porter could obtain the lease in his own name for the equal benefit of himself and Austin, the latter would attempt to secure funds for drilling operations and the investors would be given a fifty per cent interest in the lease. Porter was to supervise drilling operations and Austin was to manage finances. Thereafter defendant Reuben Harrison agreed that if a corporation were formed he would purchase stock therein. At his insistence, his personal attorney, defendant Charles Forward, was employed as attorney for the parties, and in that capacity advised the formation of a Nevada corporation and the assignment thereto of the lease. The parties agreed that the lease should be taken in the name of Porter, who would assign it to the corporation, that Porter would devote his time to drilling operations, and that funds raised by stock subscriptions would be turned over to Austin for disbursement on the project. On September 24, 1934, Porter entered into a written lease with Julius Fried and the Merritt Annex Oil Company. The lease, in addition to reserving a landowner's royalty, required the lessee to drill a specified number of wells within a stated period and contained provisions for forfeiture commonly found in oil leases. On the same day, Austin and Harrison advanced the sum of $500 to enable Porter to proceed. Drilling operations were begun the following day, and thereafter all the covenants and obligations of the lessee under the lease were fully kept and performed. On September 25th, Austin went to Bakersfield where for seven months he managed the disbursement of moneys on the project and, to the knowledge of defendants Harrison and Charles Forward, devoted virtually all his time to the venture. On October 3, 1934, Charles Forward arranged for the incorporation of the Hallmark Oil Company, Inc. under the laws of Nevada. At his direction three Nevada residents, who had no interest in the corporation, its stock, or its property, were named directors and officers of the corporation. The city of Bakersfield was designated the principal office and place of business of the corporation in California and Austin was appointed resident state agent. Subsequently, defendants Charles

Forward, James Forward, Frank Carroll, and others subscribed to the corporation's stock, which had a par value of $10 per share. On October 30, 1934, the Hallmark Oil Company, Inc. and Porter entered into a written agreement under which Porter was to assign the lease to the corporation, the corporation was to pay the bills incurred by Porter in connection with the drilling operations, and the net income from the lease was to be divided equally between Porter and the corporation after the money advanced by the latter was repaid with interest. The agreement recited a representation by Porter that drilling operations could be carried out at an initial cost to the corporation of $16,000. It expressly provided that the corporation should not be called upon to furnish a greater amount, but that any outlays in excess of that sum should be obtained from the proceeds of oil and gas produced. In the event of Porter's failure to perform the obligations imposed by the lease and agreement, the corporation could terminate his rights under the agreement, provided he was allotted a one-half interest in the proceeds received as well as in future proceeds from wells already brought into production. A similar forfeiture on the part of the corporation was provided for in the event of its default. By supplemental agreement of January 9, 1935, the amount that the corporation was obligated to expend was increased to $18,000. On November 2, 1934, in accord with the obligation imposed by the grubstake agreement of July 1st, Porter assigned to Austin one-half of all income, profits, moneys and credits to become due or payable to him under the terms of his contract with the Hallmark Oil Company, Inc. The assignment was recorded on January 31, 1935. On November 5, 1934, Austin agreed with the Hallmark Oil Company, Inc. to subscribe for $2,500 par value of its capital stock. On December 6, 1934, Porter assigned the lease to the corporation. It was evident by January 18, 1935, that the defendants were in financial difficulty and were dissatisfied with Porter's management. While more than $18,000 had been spent in development, the first well was yet to be brought into production, there were a large number of outstanding bills that could not be met, and the corporation was no longer able to finance drilling operations. Defendants Harrison, Carroll, Charles Forward, and the Hallmark Oil Company, Inc. persuaded McGuire, an employee on the leasehold, to purchase from Austin and Porter, whom they likewise prevailed upon to sell, portions of their respective

interests in the lease. In the course of that transaction, defendants persuaded Austin to secure on their behalf an agreement from Porter giving Austin the entire management of drilling operations. Austin secured such an agreement on January 23, 1935, and thereafter, until his removal in April, undertook the entire management of drilling operations. On January 28, 1935, Austin and Porter assigned five and fifteen per cent respectively of their interests to McGuire in consideration of $4,000 advanced by the latter for the payment of outstanding bills and the expenses of continued drilling operations. The $4,000 was spent by Austin in developing the project. On March 21, 1935, Charles Forward secretly directed the officers and directors of the corporation to resign and to appoint in their places defendants James Forward, Charles Forward, and Carroll. He likewise caused the board of directors to move the corporation's principal office from Bakersfield to San Diego, the county of his residence, to remove Austin as resident state agent, and to direct the bank in which the corporation had an account to dishonor any further checks drawn by Austin. On the same day, the corporation issued 130 shares of stock to plaintiff John Austin, 10 shares to plaintiff Helen Austin, and 10 shares to plaintiff Luethel Austin. With the exception of 20 shares issued to John Austin, the stock was regularly issued in consideration of the sum of $1,300 previously advanced by plaintiffs and spent with defendants' knowledge for the corporation's benefit. The stock was delivered to James Forward as plaintiffs' agent. He in turn delivered the stock to Charles Forward, who refused to surrender it on demand to plaintiffs. On March 28, 1935, after the completion of the first well, Porter quitclaimed to the Hallmark Oil Company, Inc. all his rights and interest in the contract of October 30th and in the lease. On April 9, 1935, Austin was removed from the venture. Additional wells were subsequently brought into production. On November 4, 1935, defendants Charles Forward, James Forward, and Harrison caused a California corporation, the Hallmark Oil Company, to be organized and to take over the assets of the Nevada corporation, which was then dissolved. The corporation thereafter purchased McGuire's interest under the assignments of January 28th and gave him an option to have his investment returned in cash or stock. Harrison purchased the option and exercised it, dividing the stock obtained with Charles Forward.

The trial court concluded that plaintiff John Austin was

the equitable owner of a twenty per cent interest in the leasehold and in the net profits realized or to be realized therefrom; that he was entitled to have issued to him 110 shares of stock of the Hallmark Oil Company dated as of the first issuance of stock by the corporation, together with dividends declared thereon; that he was obligated to pay the corporation $1,200 by virtue of the agreement of November 5, 1934, to be deducted from the amount of the judgment; that he was entitled to an additional 120 shares of stock as of the date of entry of judgment; and that plaintiffs Helen and Luethel Austin were each entitled to have issued to them 10 shares of stock dated as of the first issuance of stock by the corporation, together with dividends declared thereon. The court further concluded that defendants were estopped from denying that plaintiffs are the owners of such property. Judgment was entered in accord with these conclusions and this appeal followed.

Defendants maintain that the findings and judgment in favor of respondent John Austin are not supported by the evidence. They contend that Austin agreed to join with them and acquire the lease as joint adventurers, that Austin's claim and the judgment awarding him a share of the profits of the enterprise were based solely upon the written assignment of November 2, 1934, and that the assignment is unenforceable because it was made without a permit from the Commissioner of Corporations and represented an attempt by Austin to obtain a secret profit out of the enterprise in violation of his fiduciary duty. The trial court found, however, and its finding is supported by Austin's direct testimony, that there was no agreement between the parties to acquire the lease as joint adventurers. It found that Porter and Austin entered into the alleged oral grubstake agreement of July 1st and that the subsequent transactions of the parties, namely, Austin's endeavor to raise funds for drilling operations, the formation of the corporation, and the assignment of November 2nd, were designed to effectuate the plan for the development of the property envisaged by the original agreement. The challenged finding relating to the oral grubstake agreement is amply supported by the record. Austin testified that before his negotiations with defendants, Porter suggested that "if I would grubstake him for some of the expense money he would go out and try to look up some leases . . . with the understanding that any leases that he

found we would divide fifty-fifty,'' that he advanced $100 to Porter for that purpose, and that Porter discovered the property involved in this action pursuant to that agreement. Evidence introduced by defendants tending to show that the $100 advanced by Austin was furnished under a grub-stake agreement covering oil lands in another locality and that Porter had a lease on the property in question as early as June 22, 1934, does not demonstrate that Austin's testimony in this respect was inherently improbable. Austin's testimony revealed that the agreement covering land in the other locality had been abandoned, that Porter retained the money advanced by Austin, and that the agreement in question was substituted for the earlier agreement on or about August 27, 1934. There was also evidence indicating that little if any of the development work required by the purported June lease had been performed, warranting the inference that the earlier lease had been abandoned or forfeited before August 27th. There was no showing that Porter had any interest in the property on or after that date, or that Austin had knowledge of the earlier lease. On the contrary, the evidence disclosed that Austin interviewed the owners of the property, who informed him that there was no lease outstanding, and that they would be willing to enter into a lease with him and Porter. ▇▇ By virtue of the oral grubstake agreement, Austin became the equitable owner of an undivided fifty per cent interest in any lease obtained by Porter pursuant to that agreement. (See *Berry* v. *Woodburn*, 107 Cal. 504 [40 P. 802]; *Moritz* v. *Lavelle*, 77 Cal. 10 [18 P. 803, 11 Am.St.Rep. 229].) When, however, Porter subsequently assigned the lease to the Hallmark Oil Company, Inc., with Austin's consent, retaining an interest in fifty per cent of the net income of the leasehold, Austin's equitable interest or ownership was thereby limited to a share in the interest thus retained by Porter. It therefore appears that Austin's claim and the judgment do not rest solely upon the written assignment of November 2nd, and that the assignment was made in recognition of rights already possessed by Austin.

▇▇ Even if it is assumed that Austin must rely exclusively upon the assignment of November 2d, the defense based upon the Corporate Securities Act is not available to defendants. The act (Stats. 1917, p. 673, as amended, Deering's Gen. Laws, 1937, Act 3814) provides that a security issued with-

out a permit from the Commissioner of Corporations is void. Agreements assigning percentages of the production of oil and gas or moneys received therefrom have been held to be securities under the act. (*Domestic & Foreign Pet. Co., Ltd.* v. *Long*, 4 Cal.2d 547 [51 P.2d 73] ; *People* v. *Craven*, 219 Cal. 522 [27 P.2d 906] *Julian* v. *Schwartz*, 16 Cal.App.2d 310 [60 P.2d 887] ; see 26 Cal.L.Rev. 359 ; 10 So.Cal.L.Rev. 483), but the assignment herein does not fall within that category. If the transaction is one in which the assignee is merely an investor who for a consideration is given the right to share in the profits or proceeds of an enterprise to be conducted by others, the instrument representing such interest is a security. Where, however, as in the present case, the assignee is to share in the conduct of the enterprise, the instrument representing an assignment of a fractional interest in the production of oil is not a security within the act. (See *Domestic & Foreign Pet. Co., Ltd.* v. *Long, supra; People* v. *Steele*, 2 Cal.App.2d 370 [36 P.2d 40] ; 10 So.Cal.L.Rev. 483.) ▌ It is apparent also that defendants are in the position of third parties having no interest with respect to the alleged issuer or buyer and cannot therefore raise the question of compliance with the act (*Wortley* v. *Wood-Callahan Oil Co., Ltd.*, 17 Cal.2d 762 [112 P.2d 226] ; *Julian* v. *Schwartz, supra; Wachner* v. *Richardson*, 14 Cal.App.2d 422 [58 P.2d 714] ; *German Publishing Co.* v. *Scheidt*, 77 Cal.App. 238 [246 P. 88] ; 6A Cal.Jur. 530) ; ▌ Nor can they urge the invalidity of the assignment while relying upon its validity to claim the benefit of the McGuire purchase (see cases cited in 10 Cal.Jur. 645). ▌ The Hallmark Oil Company cannot question the validity of the assignment as Porter's assignee, for the purchaser of a security is not *in pari delicto* with the issuer even though he may have knowledge of the fact that no permit has been issued. (*Randall* v. *California L. B. Syndicate*, 217 Cal. 594 [20 P.2d 331] ; *Western Oil etc. Co.* v. *Venago Oil Corp.*, 218 Cal. 733 [24 P.2d 971, 88 A.L.R. 1271] ; *Walker* v. *Harbor Realty & Dev. Corp.*, 214 Cal. 46 [3 P.2d 557].)

▌ Defendants' contention that Austin's interest represents a secret profit obtained in violation of his fiduciary obligations is untenable. Austin was a promoter of the Hallmark Oil Company, and as such had a fiduciary duty to disclose to defendants his interest in his transactions with or

on behalf of the corporation. (*Victor Oil Co.* v. *Drum,* 184 Cal. 226 [193 P. 243]; *Munson* v. *Fishburn,* 183 Cal. 206 [190 P. 808]; *California Calaveras Min. Co.* v. *Walls,* 170 Cal. 285 [149 P. 595]; *Western States Life Ins. Co.* v. *Lockwood,* 166 Cal. 185 [135 P. 496]; *Lomita Land & Water Co.* v. *Robinson,* 154 Cal. 36 [97 P. 10, 18 L.R.A.N.S. 1106]; 22 Cal.L.Rev. 326.) ▮ It does not appear that he notified defendants, with the exception of Harrison and possibly Carroll, of his agreement with Porter or that he made a timely disclosure of the assignment from Porter. Whether Austin obtained a secret profit, however, turns upon whether he had a fiduciary duty to defendants at the time he acquired the alleged secret interest. (*Dunbar* v. *Redfield,* 7 Cal.2d 515 [61 P.2d 744]; *Victor Oil Co.* v. *Drum, supra;* see Ehrich, The Law of Promoters, 182, 187.) The trial court's finding that he did not is sustained by the evidence. Although the written lease was not secured until after Austin took active steps to bring about the formation of the corporation and until after Harrison contributed to the venture, Porter had previously sought and discovered the property and with Austin had come to an understanding with the owners thereof. (See *Dunbar* v. *Redfield, supra.*) The incorporation of the Hallmark company, the subscriptions by Charles Forward, James Forward, and Carroll, the written agreement between Porter and the corporation, and the assignment from Porter to Austin followed the securing of the written lease.

▮ Although defendants do not challenge the validity of the transaction whereby the corporation acquired an interest in the lease, they contend that the nondisclosure of Austin's interest was a fraud that prevented Austin from coming into a court of equity with clean hands. The evidence supports the trial court's finding, however, that defendants had knowledge of Austin's alleged secret interest in the early part of January, 1935, and that any fraud resulting from a nondisclosure of that interest had been waived. After the discovery of the alleged fraud, defendants dealt with Austin as their agent for several months, utilized his personal services, treated him as having a separate interest, induced him to persuade Porter to yield the management of the enterprise and to undertake such management himself, persuaded him to assign a part of his interest to McGuire, and requested him to persuade Porter to do likewise in order that they might all benefit from the funds advanced by McGuire. (See

*Schmidt* v. *Mesmer,* 116 Cal. 267 [48 P. 54] ; *Tucker* v. *Beneke,* 180 Cal. 588 [182 P. 299].) The finding that "the corporation had knowledge of the assignment at least as early as the early part of January, 1935," that "defendant Charles Forward . . . had knowledge of the assignment and agreement at least as early as the early part of January, 1935," and that "defendant Harrison knew of the agreement prior to any of the negotiations with any of the other defendants and had knowledge of the assignment at least as early as the early part of January, 1935," is amply supported by Austin's testimony. Austin testified that he informed Harrison of the grubstake agreement in the latter part of August, 1934, and of the assignment of November 2nd sometime in November or December. He further testified that at a meeting at the El Tejon Hotel in Bakersfield on January 19, 1935, he told Charles Forward, Harrison, and Carroll of his and Porter's interests. ▬▬ Defendants argue that the knowledge of Charles Forward, Harrison, and Carroll was not the knowledge of the corporation. While the knowledge of subscribers cannot be imputed to the corporation (*Victor Oil Co.* v. *Drum, supra; Lomita Land & Water Co.* v. *Robinson, supra*), a corporation is presumed to know what is known to its managing officers and directors. (*Sanders* v. *Magill,* 9 Cal.2d 145 [70 P.2d 159] ; see cases cited in 6A Cal.Jur. 1166.) Charles Forward, Harrison, and Carroll were not only majority stockholders but de facto directors and officers of the corporation. Charles Forward suggested and brought about the formation of the Hallmark company. Dummy directors were named at his direction and the trial court found that he "generally and ordinarily directed and managed the affairs" of the corporation. Subsequently, Charles Forward and Carroll also became nominal officers and directors. Charles Forward alone so controlled and directed the corporation that, as the court said in *Victor Oil Co.* v. *Drum,* 184 Cal. 226, 236 [193 P. 243], "the knowledge of the directors would have been but the knowledge of the defendants, and a disclosure to the directors but a disclosure to defendants."

On the issues presented by the allegation of other frauds allegedly perpetrated by Austin that are urged as a bar to this action the trial court's findings were in favor of plaintiffs and are adequately supported by the evidence.

[11] Defendants contend further that the trial court

erred in awarding Austin an interest in the leasehold on the ground that Austin had acquired merely a contract right to share in the proceeds from the sale of oil and gas produced. They argue that Austin accepted the written assignment of November 2nd in full satisfaction of his claims under the grubstake agreement of July 1st, and that since there was no reference to the transfer of any right or interest in the leasehold in the assignment, or in the pleadings, alleging the assignment, no interest in real property was conveyed. The instrument of assignment, however, purported not merely to create a personal obligation on the part of the assignor, but to sell assign, transfer, and set over ''one-half of all income, profits, moneys and credits, now or hereafter to become due or due and/or payable'' to Porter under the terms of the agreement of October 30th between Porter and the Hallmark Oil Company, Inc. This language was broad enough to include an interest in real property. Since whatever interest Porter possessed was retained by virtue of the agreement of October 30th, reference to that agreement in the subsequently executed assignment was designed to identify the property transferred and not to create a mere chose in action. ▪ The interest created by an assignment depends upon the intention of the parties (*La Laguna Ranch Co.* v. *Dodge,* 18 Cal.2d 132 [114 P.2d 351, 135 A.L.R. 546]; *National R. Co.* v. *Metropolitan T. Co.,* 17 Cal.2d 827 [112 P.2d 598]; *Callahan* v. *Martin,* 3 Cal.2d 110 [43 P.2d 788, 101 A.L.R. 871]), and while that intention is determined primarily from the terms of the instrument, the language of the assignment must be construed in the light of the facts and circumstances of the particular case. (*Schiffman* v. *Richfield Oil Co.,* 8 Cal.2d 211 [64 P.2d 1081]; *Adamson* v. *Paonessa,* 180 Cal. 157 [179 P. 880].) ▪ In view of this rule it is clear that the instrument in the present case was intended to transfer fifty per cent of the interest retained by Porter under the agreement of October 30th, regardless of the nature of that interest. By virtue of the grubstake agreement, Austin was equitably entitled to such a share, and since the intention to confer rights different from those previously held is not manifested by the terms of the assignment, it must be assumed that Porter intended it to fulfill the obligations of his trust. Thus the trial court found that Porter made the assignment of November 2nd ''pursuant to'' the agreement of July 1st. The trial court's judgment could have rested solely upon the grubstake agree-

ment and the conclusion that the subsequent assignment merely evidenced rights created thereunder. The nature of Austin's interest must therefore be determined by the nature of Porter's interest under his agreement with the Hallmark Oil Company, Inc. There can be little doubt that this agreement, in providing that "all income from the leasehold shall be equally divided" between Porter and the corporation, gave Porter an interest in oil and gas produced under the lease, amounting to an interest in real property. (*La Laguna Ranch Co.* v. *Dodge, supra; Dos Pueblos Ranch & Imp. Co.* v. *Ellis,* 44 Cal.App.2d 299 [112 P.2d 302] ; *Payne* v. *Callahan,* 37 Cal. App.2d 503 [99 P.2d 1050] ; see 26 Cal.L.Rev. 480.) Porter's interest under the lease was a *profit à prendre* (see *La Laguna Ranch Co.* v. *Dodge, supra; Callahan* v. *Martin, supra*), and by the terms of the production agreement wherein he agreed to assign the lease to the corporation he did not merely retain an interest in the production of oil and gas but remained in effect the operating lessee. The agreement recites Porter's ownership of the lease, the wish of the parties that he drill certain wells in accord with the provisions of the lease, and Porter's covenant to comply with the obligations of the lease. It clearly contemplated that he alone would conduct drilling operations. The corporation's function was to furnish capital for that purpose, to hold legal title to the leasehold for the protection of the investors, and to assist Porter so far as possible. Except in the event of Porter's default, it was not to receive more than its share of the oil and gas produced. At most, Porter assigned to the corporation an interest in his *profit à prendre,* to make the assignee a tenant in common of his leasehold estate. In *La Laguna Ranch Co.* v. *Dodge,* 18 Cal.2d 132 [114 P.2d 351, 135 A.L.R. 546], this court characterized the lessee's operating rights as the *sine quo non* of a *profit à prendre.* The conclusion is thus inevitable that under the agreement of October 30th, Porter retained an interest in real property, a *profit à prendre,* and that the assignment of November 2nd created in Austin an interest in real property.

▇▇▇ Defendants next contend that Porter's interest, whatever its nature, was partially forfeited under the agreement of October 30th because of his default thereunder, that Porter was therefore entitled to share only in the proceeds from the first well, and that Austin, as Porter's assignee, can

claim no greater rights than Porter's. The trial court found that Porter did not refuse to perform his contract and that he was never in default thereunder, but defendants maintain that the finding is not supported by the evidence. It is their contention that the undisputed evidence shows that Porter agreed under the contract of October 30th to perform the conditions of the lease, including the commencement of a second well within sixty days after the completion of the first, but that he failed to do so and instead abandoned the contract and left the leasehold in March, 1935. This contention overlooks the significance of the contract secured by Austin from Porter on January 23, 1935, whereby the latter relinquished to the former the management and control of operations on the leasehold. The contract was secured at the solicitation of defendants. It provides: "John Austin shall have the entire management and control of . . . operations on said lease and all of them, and of the purchase of all machinery, equipment and supplies, and the said John Porter shall give his time and personal services in said operations and in carrying out the terms and conditions of the original lease . . . and the agreement between Hallmark Oil Company, Incorporated and said Porter, under the control and direction of said John Austin." Porter was to receive $150 per month for his services. It is clear that following this agreement and at the time of the alleged default and abandonment, Porter was merely an employee without power to conduct drilling operations. The corporation thereafter looked to Austin for the performance of the conditions of the lease, and there is no suggestion that he was in any manner remiss in his duties. By April 9, 1935, when he was removed, well number one was producing profitably and Austin had arranged for the drilling of a second well. There is likewise no suggestion that the lease was ever in default.　　　Defendants contend, however, that Porter was also in default at the time the management agreement was entered into because he had used all the moneys agreed to be advanced by the corporation and no funds from the production of oil were available to continue operations. Porter had represented under the contract of October 30th that drilling operations could be carried out at an "initial" cost to the corporation of a sum not to exceed $16,000 (later raised to $18,000) and had agreed to perform the conditions of the lease provided these funds and the proceeds derived from the sale of oil and gas

produced on the leasehold were made available by the corporation. There was no cessation of drilling activities at the time of the alleged default. Plaintiffs argue that the management agreement of January 23rd was motivated by what defendants deemed an abuse of credit rather than by Porter's failure to obtain credit. It is unnecessary, however, to determine whether Porter's alleged inability to proceed because funds were not available constituted a breach of the agreement of October 30th. The Hallmark Oil Company, Inc., waived any previous default or forfeiture when it induced Porter to enter into the management agreement with Austin and assign a portion of his interest to McGuire so that additional funds would become available to continue the project for the benefit of all the parties. By negotiating with the defaulting party the corporation recognized the validity of the contract and indicated that it did not claim a forfeiture. (See *Knarston* v. *Manhattan L. Ins. Co.,* 124 Cal. 74, 80 [56 P. 773]; cases cited in 12 Cal.Jur. 641.) Austin testified that at a meeting at the El Tejon Hotel in Bakersfield on January 19, 1935, he suggested and defendants assented to the arrangement giving him the management of the lease "with the understanding that I would try to finance the continuous operation of it under his (Porter's) contract in some form." In a letter to Charles Forward on January 23, 1935, informing him of the execution of the agreement of that date, Austin stated: "A part of the inducement to get him (Porter) to sign this agreement with me was to preserve his interests in the wells." In a reply dated January 24, 1935, Charles Forward stated that it was unfortunate that after Porter had "flatly breached" his contract Austin had to obtain funds or credit to continue operations on the property as a condition precedent to his becoming manager, in order to protect Porter's fifty per cent interest. The letter also contains the following: ". . . those interested in the Porter 50 per cent interest lose nothing irrespective of how much the drilling operations cost. Their interests are not prejudiced or cut down by increasing the capital expenditure, but such interest remains constant,—that is, 50 per cent irrespective of whether the drilling operations cost $18,000 or $100,000." In inducing Porter to yield a part of his interest to McGuire, the corporation recognized Porter's interest. It likewise persuaded Austin to secure the management agreement, undertake its obligations, and assign a share of his interest to McGuire in

the belief that Porter's rights had not been forfeited. Defendant's conduct induced the belief that the alleged default and forfeiture had been waived. (See *Dool* v. *First National Bank of Calexico,* 209 Cal. 717 [290 P. 15]; *Allen* v. *Hance,* 161 Cal. 189 [118 P. 527]; Cal.CodeCiv.Proc., sec. 1962, subd. 3; 10 Cal.Jur. 611.)

Defendants contend finally that Austin's rights were terminated or limited by the execution of the written instrument of March 28, 1935, in which Porter quitclaimed to the Hallmark Oil Company, Inc., all his interest or rights under the agreement of October 30th. The trial court found that this agreement was not entered into in good faith and was not supported by consideration. There is no need to consider defendants' contention that the finding of lack of good faith is unsupported by the evidence, for even assuming its execution in good faith, the instrument did not prejudice Austin's rights. Porter could not effectively abandon a contract when the performance of his obligations thereunder had previously been assumed by Austin with the agreement of all concerned. At the time of the purported quitclaim the Hallmark company was aware of the assignment of November 2nd, and Austin's rights are therefore clearly entitled to protection. (*Schiffman* v. *Richfield Oil Co., supra.*) *La Laguna Ranch Co.* v. *Dodge, supra,* insofar as it is cited in support of defendants' contention, does not apply to the present case. It was there held that a lessee's voluntary surrender of a leasehold by a quitclaim deed terminated the interests of holders of overriding royalties created out of estate of the lessee. In the present case, the leasehold remained intact at all times and was unaffected by the quitclaim executed on March 28th.

The original complaint in this action was filed on February 2, 1937, nearly two years after John Austin was ousted from the enterprise. Between April 9, 1935, and February 2, 1937, the Hallmark Oil Company spent large sums of money in completing the project, and John Porter, who could have elucidated the transactions on which Austin based his claim to an interest in the leasehold, died. The trial court rejected defendants' contention that under these circumstances plaintiffs were guilty of laches as a matter of law. The existence of laches is determined by the trial court in the light of the facts and circumstances of the particular case. (*Fry* v. *Board of Education,* 17 Cal.2d 753 [112 P.2d 229]; *Toomey* v. *Toomey,* 13 Cal.2d 317 [89 P.2d 634]; *Wol-*

*pert* v. *Gripton,* 213 Cal. 474 [2 P.2d 767]; *Newport* v. *Hatton,* 195 Cal. 132 [231 P. 987]; *Brown* v. *State Personnel Board,* 43 Cal.App.2d 70 [110 P.2d 497]; see 10 Cal.Jur. 520.) **[18a]** In the present case there was an explanation for the alleged delay. Under the agreement of October 30th, Austin was not entitled to share in the proceeds from the leasehold until the property was fully developed, and at the date of his removal only the first well had been brought into production. There was evidence indicating that Austin made efforts to reach a conciliatory agreement with defendants, which were met with evasion and delay. ▮ A defendant may be estopped from urging the defense of laches where his conduct contributed to the delay. (*Smetherham* v. *Laundry Worker's Union,* 44 Cal.App.2d 131 [111 P.2d 948]; *Powell* v. *Oak Ridge Orchards Co.,* 84 Cal.App. 714 [258 P. 636]; see 10 Cal.Jur. 535.) Moreover, the mere lapse of time without prejudice to defendants does not constitute laches. (*Cohn* v. *Cohn,* 7 Cal.2d 1 [69 P.2d 969]; *Wolpert* v. *Gripton, supra; McMahon* v. *Grimes,* 206 Cal. 526 [275 P. 440; *Newport* v. *Hatton, supra.*) While the complaint was not filed until after the Hallmark Oil Company had spent large sums of money to complete the enterprise, its success was assured before Austin's ouster. The expenditures in the present case were not induced by the alleged delay in bringing this action, and the mere expenditure of money or effort on the part of a defendant is insufficient to show prejudice. (*Verdugo Cañon Water Co.* v. *Verdugo,* 152 Cal. 655 [93 P. 1021]; *Lux* v. *Haggin,* 69 Cal. 255 [4 P. 919, 10 P. 674]; see 10 Cal.Jur. 531.) ▮ The death of a material witness is but one circumstance that the trial court considers in determining whether prejudice resulted from the lapse of time. (*Goodfellow* v. *Barritt,* 130 Cal.App. 548 [30 P.2d 740]; see 10 Cal.Jur. 532.) ▮ It does not appear that the trial court abused its discretion in refusing to sustain defendant's plea of laches. (See *Suhr* v. *Lauterbach,* 164 Cal. 591 [130 P. 2]; *Brown* v. *State Personnel Board, supra.*)

▮ The principal finding underlying the judgment awarding plaintiffs stock in the Hallmark Oil Company is that on or about November 5, 1934, John Austin agreed with the Hallmark Oil Company, Inc., to subscribe for $2,500 worth of its capital stock and paid the corporation $1,300 on account thereof. Defendants themselves repeatedly testified

that Austin agreed to purchase stock. Nevertheless, they urge that since Austin testified that he never intended to contribute any money to the venture, that is, ''any more than I had to or unless I was forced to put some money into the venture,'' he is not entitled to stock in the corporation. The manifest and not the secret intent of the parties, however, is the basis of the contract between them. ■ Defendants challenge the finding that Austin paid $1,300 to the corporation under his agreement and maintain that he contributed nothing. The record, however, discloses that Austin paid $1,000 to the corporation and that stock was issued in consideration therefor. Although these funds were apparently held in trust by him for the benefit of one Samuel McFadden any trust agreement with respect to such stock is of concern only to the trustor and trustee. ■ An audit of Austin's accounts disclosed that an additional sum of $300, representing his personal funds, was invested in the enterprise. The trial court therefore did not err in awarding plaintiffs 130 shares of stock in the defendant corporation. ■ The court went on to hold, however, that by reason of his agreement to subscribe for $2,500 par value of stock, Austin is entitled to have issued to him 120 additional shares and is obligated to pay the corporation $1,200, to be deducted from the amount of the judgment. That holding was erroneous. It is not appropriate to grant specific performance of a subscription contract when the complainant, instead of paying for the stock subscribed to at the time the corporation is in great need of funds, does not offer to pay until the success of the venture undertaken by the corporation is assured.

The judgment therefore is modified by striking therefrom the provision that the defendant Hallmark Oil Company make, issue, and deliver to and in the name of John Austin a certificate of its capital stock for 120 shares to be dated as of the date of the entry of judgment herein, and as so modified it is affirmed, each side to bear its own costs on appeal.

Gibson, C. J., Shenk, J., Curtis, J., Carter, J., and Spence, J. pro tem., concurred.

Appellants' petition for a rehearing was denied April 1, 1943.