[Civ. No. 6657. Fourth Dist. Oct. 29, 1962.]

U-TEX OIL COMPANY, Plaintiff and Respondent, v. EDWIN W. PAULEY et al., Defendants and Appellants.

Dolley, Jessen & Painter, Louis Miller and Orris Hedges for Defendants and Appellants.

Robert E. Krause and Louis C. Hoyt for Plaintiff and Respondent.

SHEPARD, J.—This is an appeal by defendants from a judgment in favor of plaintiff in a quiet title action involving lease forfeiture and damages.

## PLEADING

Because of some questions relating to what issues were before the trial court, it is necessary briefly to outline the pleading. Prior to judgment, all defendants except the Pauleys were dismissed from the action. For brevity, plaintiff will hereinafter be called U-Tex and defendants will be called Pauley.

Two causes of action are set forth in the complaint. The first cause is in the form of a quiet title action with the usual allegation of title in U-Tex and claims without right by Pauley. The answer places the right of Pauley in issue. The second cause, in essence, alleges (1) the corporate existence of U-Tex, fictitious names of defendants, and the ownership of U-Tex; (2) execution on February 18, 1945, by C. M. and L. A. McCain, hereinafter called McCain, as lessors, to John McLeod and Delaney Petroleum Corporation, hereinafter called McLeod, as lessees, of an oil and gas lease; recordation thereof; modifications of said lease on April 4, 1946, and May 16, 1946, by agreement between McCain and Beverly Oil Company, a corporation, hereinafter called Beverly, and Signal Petroleum Corporation of California, Ltd., a corporation, hereinafter called Signal; assignment of said lease April 8, 1947, from Beverly to Pauley; recordation thereof; (3) provision in said lease for drilling 14 wells and modification on May 16, 1946, to a requirement of 10 wells; (4) provisions for 90-day notice of breach modified subsequently to 30 days; (5) Pauley's

ownership of lease; (6) oil discovery in paying quantities, the drilling of 9 more wells; (7) lack of a well producing for Pauley; (8) failure of Pauley to protect from wells on adjacent land draining from same pool; (9) notice April 21, 1958, to Pauley of alleged failure of Pauley to drill additional wells and of termination of lease on failure to remedy breach within 30 days; demand for quitclaim deed; (10) failure of Pauley to drill the tenth well; (11) failure to drill offset wells; (12) breach of lease by failure to drill and produce as alleged in (8), (9), (10) and (11) above; (13) demand, November 1, 1958, for quitclaim and refusal by Pauley; (14) attorney employment; (15) Pauley's failure to surrender possession after demand; (16) request for $150 forfeiture under section 794, Civil Code. Prayer is for quiet title, injunction, attorney fees, forfeiture of $150, actual damages of $277,000 and $100,000 punitive damages.

The answer, in essence, denies in detail all allegations of breach of lease conditions and denies U-Tex's right to possession or quitclaim but admits the assignment from Beverly to Pauley and that Pauley claims lease title thereunder. By a second defense Pauley alleged that McCain had relinquished lessors' right to terminate for failure to drill the tenth well and that U-Tex is estopped to claim forfeiture. The third defense alleged release and discharge of Pauley's drilling obligation for a tenth well. The fourth defense alleged that U-Tex was not the owner at the time it gave the 30-day notice of default and that no such notice was ever given by the owner. The fifth defense simply denied default in lease obligations by Pauley. The sixth defense alleged waiver of any asserted breach by acceptance by U-Tex, after complaint was filed, of certain royalty payments, with full knowledge of the facts. The seventh defense asserts that after complaint was filed U-Tex requested, pursuant to the lease, certain electrolog information on the wells drilled and Pauley sent U-Tex said information; that the continued existence of the lease was thus acknowledged by U-Tex and it is estopped to maintain this action.

## FACTS

The parties do not disagree substantially as to the facts, but do disagree sharply on their interpretation and legal consequences. In essence, the facts are as follows: On February 8, 1945, McCain as lessors leased to McLeod as lessees under the lease in question 132+ acres of land in Orange County. By

mesne assignments Beverly received lessees' interest. On April 4, 1946, Beverly made a partial assignment to Signal but reserved to Beverly a 3½ per cent overriding royalty plus certain drilling rights. On November 15, 1946, Signal re-assigned to Beverly but reserved two wells called Signal-McCain 1 and 2. These ultimately went to W. E. Nicolai and Fred E. Christ, hereinafter called Nicolai, and are excepted from the forfeiture provisions of the judgment.

On April 4, 1946, paragraph 4 of the lease (see note 1) which paragraph provided for conditional compulsory drilling of 14 wells, was modified to change the minimum time lapse between completion of a well to commencement of the next well from 90 to 60 days and the lessee's time to remedy a default after notice was changed from 90 to 30 days. On May 16, 1946, the minimum number of wells was changed from 14 to 10. Paragraph 5 (see note 2) provided that upon a quit-claim of part of the land by lessee to lessor "the drilling

---

[1] "4. Upon discovery of oil in paying quantities in any well drilled on demised premises, the Lessee shall commence the drilling of another well within ninety days thereafter, and shall thereafter continuously operate not less than one well drilling outfit, allowing ninety days between completion of one well and commencement of the next succeeding, until 14 wells shall have been drilled, including offset wells; provided that, upon failure to find oil in paying quantities in the first or any subsequent well drilled under the terms hereof, this lease shall remain in full force and effect, at the option of the Lessee, if Lessee elects (without forfeiture of any right to subsequently drill for and produce oil) to operate any such well or wells as natural gas wells and operate the premises for natural gas development purposes, in which event the drilling obligations herein-above in this paragraph contained shall be reduced to one-fourth the number of wells specified. Nothing herein shall be construed to limit the number of wells which the Lessee may drill, should it so elect, in excess of the number hereinabove specified, nor limit the depth to which any well may be drilled or deepened by Lessee should it desire to drill below the depth specified. The Lessee shall have the right at all times to operate, deepen, redrill and maintain all producing oil and/or gas wells upon said property."

[2] "5. Lessee may at any time, and from time to time, either before or after discovery of oil and/or gas on the demised premises, quitclaim the said premises, or any part thereof, to the Lessor, his successors or assigns. Upon the quitclaiming of any part of the land to the Lessor, his successors or assigns, all rights and obligations of the parties hereto, one to the other, shall cease and determine as to the portions of the premises quitclaimed (except that the Lessee may continue to enjoy such easements on the surrendered premises as may be in use at the time of the surrender) and the drilling requirements hereunder shall be reduced pro rata according to acreage retained by the Lessee. Except as herein provided, full right to said land shall revest in the Lessor free and clear of all claims of the Lessee, except that the Lessor, his successors or assigns, shall not drill any well on said surrendered land within 330 feet of any producing oil well or within 660 feet of any gas well on land retained by Lessee."

requirements hereunder shall be reduced pro rata according to the acreage retained by the lessee.'' On April 8, 1947, Beverly assigned its interest to Pauley but reserved a 3½ per cent overriding royalty in production value. On June 6, 1957, Pauley quitclaimed to McCain (then owner-lessor) 24+ acres of the land under lease. (There appears to be a variance of about one acre between the findings and the evidence, but this is immaterial.) Thus the remaining acreage held under lease was then reduced from 132 to about 107, or a pro rata reduction in the neighborhood of 18 per cent.

From the date of the lease until July 1949 there were nine wells drilled and oil in paying quantities was found. No other wells have been drilled. On June 6, 1949, McCain as owner acknowledged that the lease was in full force. During 1949 to 1957, Pauley made royalty payments to McCain with full knowledge by McCain that the tenth well had not been drilled, and without any objection by or notice of lease default by McCain.

On October 21, 1956, L. A. McCain died. On February 27, 1958, U-Tex and Ralph Hawks, hereinafter called Hawks, offered to buy the land covered by the lease, subject to probate court approval. The terms of offer provided a $26,300 deposit, $58,700 within 90 days, the balance of $178,000, to be evidenced by a deed of trust and note, with the buyers taking title as tenants in common, U-Tex as 65 per cent and Hawks as 35 per cent. The order approving the sale was made March 14, 1958. The attorney for the executors on the same day orally told U-Tex' superintendent to take possession. Hawks, on March 17, 1958, gave a grant deed for his interest to U-Tex but the deed was not recorded until June 13, 1958. Actually, U-Tex appears to have been thereafter holding title for the benefit of one Snyder as to a 25 per cent interest and Hawks as to 10 per cent interest. Nothing is said in the offer of purchase nor in the order confirming sale regarding possession in U-Tex. The deed to U-Tex and payment money were deposited in escrow with the Orange County Title Company and the deed was delivered from escrow and recorded May 26, 1958. Prior to deed delivery McCain collected all rents and royalties, but after deed delivery these amounts were prorated to U-Tex and McCain as of March 14, 1958.

On April 20, 1958, U-Tex gave Pauley a 30-day notice of lease default and election to terminate. U-Tex therein recited that it was the owner. The record does not show that on April 20, U-Tex had deposited in escrow or otherwise tendered the

balance of $58,700 necessary for it to receive title. On May 13, 1958, Pauley replied that the title company had no record of title in U-Tex and he requested a copy of title instruments. This last request was not complied with but May 26, 1958, U-Tex' attorney, by letter, stated to Pauley that the lease was terminated.

Beverly was made a party defendant but was dismissed from the action on motion of plaintiff prior to judgment. Beverly was dissolved a few years prior to commencement of this action and its assets had been distributed to the estate of William Cary Hay (Beverly's sole owner) and thence to Hay's wife, Dorothy, and daughter Beverly, who were his heirs. Neither of the said heirs was named a party herein.

During 1958 and 1959, royalty payments were made by check from Pauley to U-Tex. The checks were retained by U-Tex without objection but were not cashed. September 18, 1959, U-Tex requested of Pauley a copy of the electrologs for the wells. Pauley complied.

### Indispensable Parties—Time for Objection

Pauley first contends that Beverly and the two distributees of Beverly's assets, that is, Dorothy L. Hay and Beverly E. Hay, were indispensable parties to this action and that failure to join them as parties deprives the court of jurisdiction to render a valid judgment.

The rule requiring indispensable parties to be brought before the court is contained in the first sentence of Code of Civil Procedure section 389, which says, in part:

"A person is an indispensable party to an action if his absence will prevent the court from rendering any effective judgment between the parties or would seriously prejudice any party before the court or if his interest would be inequitably affected or jeopardized by a judgment rendered between the parties.

". . . . . . . . .

"When it appears that an indispensable party has not been joined, the court shall order the party asserting the cause of action to which he is indispensable to bring him in."

The meaning of this section has been defined and interpreted in numerous cases. In *Ambassador Petroleum Co.* v. *Superior Court*, 208 Cal. 667, 671, 672 [284 P. 445], quoting with approval from *Mitau* v. *Roddan*, 149 Cal. 1 [84 P. 145, 6 L.R.A. N.S. 275], and *Alpers* v. *Bliss*, 145 Cal. 565 [79 P. 171], the court says,

". . . But when the trial court finds, or the record indisputably shows, that a 'complete determination of the controversy cannot be had without the presence of other parties,' such parties become necessary and indispensable parties and the section is mandatory and the question then becomes one of jurisdiction in that the court may not proceed without bringing them in. . . .

" 'It is the general rule in equity, continued in force by the provisions of the Code of Civil Procedure (§ 389), that all who are interested in the subject matter of a litigation should be made parties thereto, in order that complete justice may be done, and that there may be a final determination of the rights of all parties interested in the subject matter of the controversy.' 'The "other parties" who may be brought in must be persons whose presence is essential to the complete determination of a controversy between the parties who are already before the court.' "

A similar statement of the rule is quoted from *Waterman* v. *Canal-Louisiana Bank & Trust Co.*, 215 U.S. 33 [30 S.Ct. 10 at page 14, 54 L.Ed. 80]. See also *Bank of California* v. *Superior Court*, 16 Cal.2d 516, 521-523 [4-8] [106 P.2d 879] ; *Hartman Ranch Co.* v. *Associated Oil Co.*, 10 Cal.2d 232, 262 [19] [73 P.2d 1163].

U-Tex claims that the objection that indispensable parties were not joined cannot be raised for the first time on appeal. Beverly was made a party defendant in the complaint but was dismissed some time before judgment. It is possible that the dismissal occurred prior to trial, but the record does not show this. The objection of nonjoinder of indispensable parties was set forth at length to the trial court in the motion for a new trial. *Elbert, Ltd.* v. *Gross*, 41 Cal.2d 322 [260 P.2d 35], cited by respondent, refers to a "necessary" party. All of the other cases cited by respondent refer to "necessary" or "proper" parties and not to "indispensable" parties except *Reid* v. *Gillespie*, 87 Cal.App.2d 769 [197 P.2d 566]. On the other hand, it was directly held in *Hartman Ranch Co.* v. *Associated Oil Co., supra*, p. 265 [20], "The objection that an indispensable party has been omitted may be raised at any time by the trial or appellate court of its own motion if the parties fail to make the objection. The requirement that indispensable parties be before the court is mandatory."

This rule is cited with approval in *Bank of Calif.* v. *Superior Court*, 16 Cal.2d 516, 522 [5] [106 P.2d 879] ; *Holman* v. *County of Santa Cruz*, 91 Cal.App.2d 502, 522 [205 P.2d 767] ;

*Castro* v. *Giacomazzi Bros.*, 92 Cal.App.2d 39, 45 [6] [206 P.2d 688]; *Sime* v. *Malouf*, 95 Cal.App.2d 82, 116 [33] [212 P.2d 946, 213 P.2d 788]; *Child* v. *State Personnel Board*, 97 Cal.App.2d 467, 468, 469 [1] [218 P.2d 52]; and *Miracle Adhesives Corp.* v. *Peninsula Tile Contractors Assn.*, 157 Cal. App.2d 591, 595 [5] [321 P.2d 482]. ▓ From the foregoing it is clear that the failure to include a truly indispensable party is a defect that can be raised at any time even by the appellate court of its own motion.

### INTEREST OF BEVERLY AND HAY

U-Tex contends that neither Beverly nor Hay were indispensable parties.

By its reservations in the partial assignment to Signal on April 4, 1946, Beverly reserved all drilling and production rights below a depth of 2,700 feet, all wells already drilled, and also an overriding $3\frac{1}{3}$ per cent royalty from wells brought into production by Signal, subject to certain specified deductions. On November 15, 1946, Signal reassigned to Beverly but excepted therefrom two producing wells called Signal-McCain Nos. 1 and 2, the $3\frac{1}{3}$ per cent overriding royalty remaining in effect as to said two wells and Beverly reassuming the duty to keep lessees' obligations under the parent lease fully performed. Said two wells are now operated by Nicolai.

▓ On April 8, 1947, Beverly assigned its remaining interest in the lease to Pauley but reserved to itself a $3\frac{1}{2}$ per cent overriding royalty on Pauley's production, and excepted Signal's reserved interest under the reassignment of November 15, 1946. Pauley assumed the obligations of the parent lease and agreed to give Beverly first refusal after a 30-day notice in case Pauley desired to quitclaim to the owner-lessor any part of the land covered by the lease. While Beverly could not, under the lease, interfere with active operations, it did retain the right of reassignment and reentry in case Pauley decided to quitclaim. Under the foregoing facts there was a conditional right of reentry reserved to Beverly and through Beverly to Hay. From the complicated interrelationship of the rights and duties of the parties it becomes clear that no judgment terminating the rights of Pauley could avoid affecting the rights of Beverly or Hay. ▓ As was said in *La Laguna Ranch Co.* v. *Dodge*, 18 Cal.2d 132 [114 P.2d 351, 135 A.L.R. 546] at page 140 [6], "Defendants' overriding royalties were, therefore, interests in real property. [Citations.] The interests thus created were not unlimited

but were determinable interests limited to the duration of the existing lease. Termination of the oil and gas lease would result in the termination of the interests created under it.''

Pauley was the active operator on whose shoulders rested production. But Beverly also had outstanding operative obligations to Nicolai. Whether Beverly-Hay had any defense to the present action could be discovered only by lawful disclaimer or by bringing them in as parties so that they might be heard. By its judgment herein the court excepted from forfeiture Pauley's No. 3 well, also called McCain No. 3 well, with sufficient land to service said well, the tanks, tank site and sump for servicing said well and the two Nicolai wells. U-Tex apparently infers that there is some reservation in the judgment preserving the rights of Beverly and Hay. U-Tex does not point out what words of the judgment purport to preserve the rights of such nonjoined parties and we have found none. As was said in *Hartman Ranch Co.* v. *Associated Oil Co., supra,* at page 263:

''It cannot be said that the adjudication for a forfeiture will be binding only as between parent lessor and sublessee, and that the rights of the lessees-sublessors may be saved. Under the decree of forfeiture it would be the duty of the sublessee to surrender possession to the parent lessor. Such a surrender would result in the sublessors losing their tenant, the sublessee, and in termination of the parent lease under which they have rights as lessees.'' (See also *Garner* v. *Knudsen,* 129 Cal.App.2d 747, 756, 757 [277 P.2d 890]; 30 Cal. Jur.2d, § 241, p. 385.)

Authorities cited by U-Tex are not in point. All of them are cases in which the indispensable parties were before the court as actual litigants or had been served with due process and had defaulted. It would appear that the overriding royalty and right of conditional reversion through reassignment that originally rested in Beverly has long since passed to Hay and that Hays are now the real parties in interest. It is unnecessary to examine that point further, however, as none of them was joined. Whoever held this interest was indispensable since any judgment rendered must inevitably affect that interest and the owner had a right to be heard.

### Drilling Requirements

Pauley contends that the court's finding that under the terms of the lease Pauley was obligated to drill a tenth well and that his failure to do so was a breach of the lease was contrary to the provisions of the lease and was error. We

agree. It must be noted that on May 16, 1946, paragraph 4 of the master lease was amended to reduce the compulsory number of wells to 10. This modification expressly retained in effect all other provisions of the master lease. Paragraph 5 of the lease provides, in effect, that when the lessee quitclaims any of the land the drilling requirements of the lease will be reduced pro rata. Under date of June 6, 1957, Pauley quitclaimed 24+ acres to McCain. The deed was recorded July 24, 1957. This quitclaim clearly reduces the drilling requirement to nine since the acreage decreased from 132+ to 107+, about 18 per cent, and nine wells had already been drilled. By paragraph 26 of the master lease, its covenants extend to all assignees. By the assignment from Beverly to Pauley a similar provision is made.

██ U-Tex, whose predecessor in interest, McCain, accepted the quitclaim deed, now suggests that the evidence does not show the required consent from Beverly or Hay. Nowhere does U-Tex even suggest that McCain or U-Tex either rejected the quitclaim deed or made any effort to restore to Pauley the title gained. (*Neet* v. *Holmes,* 25 Cal.2d 447, 458 [5] [154 P.2d 854].) U-Tex made no effort to produce evidence to dispel the presumption (as to U-Tex) of regularity of the deed under the circumstances. (Code Civ. Proc., §§ 1963, subds. 19, 20; *Ross* v. *Real Estate Investment Co.,* 135 Cal.App. 563 [26 P.2d 30, 28 P.2d 52]; *Donovan* v. *Security-First Nat. Bank,* 67 Cal.App.2d 845, 853 [4] [155 P.2d 856]; *Willis* v. *Holback,* 33 Cal.App.2d 145, 147 [1] [91 P.2d.140].) U-Tex stands squarely in the shoes of McCain and cannot now be heard to challenge the validity of a quitclaim deed accepted by McCain for the benefit of the title now held by U-Tex. (Civ. Code, § 3521; *Austin* v. *Hallmark Oil Co.,* 21 Cal.2d 718, 727 [5] [134 P.2d 777]; *Walmsley* v. *Holcomb,* 61 Cal.App.2d 578, 582 [2] [143 P.2d 398].) ██ The maximum compulsory drilling required by the lease under the undisputed facts was 9 and not 10.

U-Tex now contends that this point is urged for the first time on appeal. We find no merit in this contention. The record does not support it. Because of this contention we heretofore set forth in some detail the essential elements of the pleadings. An examination of the pleadings clearly shows that the contention that ten wells was the compulsory drilling requirement was in issue. The trial court, by finding number V, found as a fact that Pauley quitclaimed 24+ acres (error of one acre is immaterial). There was, in truth, no contrary evidence.

NOTICE OF DEFAULT AND ELECTION TO TERMINATE

 Pauley contends that the 30-day notice of default and election to terminate lease was ineffectual for any purpose since U-Tex, at the time it gave the only such notice given, was not the owner nor lawfully in possession of the leasehold land. U-Tex asserts the notice was valid because on March 14, 1958, one McCain executor orally told U-Tex' superintendent to take possession and U-Tex did take token possession by erecting a barbed wire fence and gate along about 80 feet of the boundary of the property. The total boundary of the property was about 10,000 feet; access was had through many different roads. Actual physical possession was held by a tenant farmer except for oil well sites, access roads, and necessary accessories of the wells.

In examining the question, several points of undisputed evidence immediately require attention. First, the owners' interest was in the course of probate; nothing in the call for bids or the U-Tex-Hawks bid nor the order confirming sale makes any provision for possession in the prospective buyer before final consummation of title in the buyer. The order confirming sale was conditional, reciting that upon the buyers' payment to the executors of $85,000 cash and execution and delivery of a promissory note of $178,000 and trust deed, the executors were directed to deliver the deed. As was said in *Barnes* v. *Morrison*, 102 Cal.App. 152, 157 [4] [282 P. 986], "The order confirming the sale does not convey the title, but merely authorizes the conveyance upon specified terms and conditions."

 Mrs. Frazer, a McCain coexecutor, testified that on March 14, 1958, the day of sale confirmation, she told Snyder, the U-Tex superintendent, to take possession. Baxter, the other coexecutor, states he never gave permission for U-Tex to take possession until May 26, 1958. The will of J. Adrian McCain, under which Mrs. Frazer and Baxter were named as coexecutors, made no provision for either to act separately from the other except if one did not qualify. But here both did qualify and act. The question arises under the implications of Probate Code section 920 whether or not one coexecutor may lawfully surrender possession without the consent of the other under the circumstances here present.

We have no doubt that in respect to many duties one coexecutor may perform valid acts without the active consent of the other such as the marshalling of assets and the performance of other lawful duties involving protection of the estate.

Neither party to this proceeding has cited and we have been unable to discover any prior decision touching the precise problem here presented. In reason, however, it would seem improper for either executor acting alone to gratuitously grant possession of valuable property prior to the time contemplated by the bids, the return and the order conditionally confirming sale. Obviously, possession of property is a valuable right. Giving it away at a time prior to that contemplated by the court proceeding might well be to the serious disadvantage of the estate. At the time U-Tex claims oral permission to take possession was given, the conditions fixed by the court for passage of title had not been complied with and, as far as anyone then knew, might never be complied with.

Furthermore, in the case here at bar, the question as to whether U-Tex's token possession was sufficiently real to permit it to take one of the more drastic of all steps which an owner can take, to wit, making the decision that a long term lessee was in default, and taking the first decisive step toward ouster, raises an additional serious challenge. The actual physical possession of the oil properties remained in Pauley and Nicolai. The surface farming remained in the possession of the tenant farmer. Rents were collected by McCain, not U-Tex.

Certainly U-Tex cannot read into the order confirming sale something that it does not contain. (*Baldwin* v. *Stewart*, 218 Cal. 364, 368 [23 P.2d 283]; 20 Cal.Jur.2d § 502, p. 716.) ▮▮▮ Right to possession follows the legal title in the absence of a contrary agreement. (*Stratton* v. *California Land etc. Co.*, 86 Cal. 353, 364 [24 P. 1065]; *Jiral* v. *Day*, 95 Cal.App.2d 214, 217 [3] [212 P.2d 275]; *Wilson* v. *Sanchez*, 116 Cal.App. 2d 670, 675 [4] [254 P.2d 594]; *Hayward Lumber etc. Co.* v. *Starley*, 124 Cal.App. 283, 287 [1] [12 P.2d 66].) ▮▮▮ Any notice of forfeiture or termination of an oil lease, prematurely given, is ineffectual for any purpose. (*Welport Oil Co.* v. *Fairfield*, 51 Cal.App.2d 533, 537 [125 P.2d 97].) Only a person whose title places him in the position of landlord can exercise such prerogatives. (*Murphy* v. *Hopcroft*, 142 Cal. 43, 45, 46 [75 P. 567].)

▮▮▮ Pauley's prompt investigation of the title after receiving the notice disclosed U-Tex' lack of title. Pauley's demand for evidence of title and U-Tex' failure to comply justified Pauley in refusing to give recognition to the notice. We are forced to the conclusion that U-Tex did not have either the title or possession necessary to give it the right to terminate the lease or to give effective notice thereof.

It must, of course, be conceded that if the purchaser at a probate sale fulfills the conditions contained in the court's order confirming sale, the title that passes will, for the purpose of prorating the rents, issues and profits of the land, be considered as having passed as of the date of confirmation in the absence of an order or agreement to the contrary. However, we think that is the extent of that rule unless actual possession is surrendered to the buyer. If this were not true, the confusion which could be created by a buyer who had not complied with the probate court's order would ramify too far for description and could create untold damage to the property of the estate.

Our views hereinbefore set forth render discussion of further points raised by Pauley unnecessary.

The judgment is reversed.

Griffin, P. J., and Coughlin, J., concurred.

A petition for a rehearing was denied November 21, 1962, and respondent's petition for a hearing by the Supreme Court was denied December 26, 1962.